585 So.2d 965 (1991)
HOME BUILDERS AND CONTRACTORS ASSOCIATION OF BREVARD, INC. and Florida Home Builders Association, Appellants,
v.
DEPARTMENT OF COMMUNITY AFFAIRS, Florida League of Cities and Charlotte County, Appellees.
No. 90-128.
District Court of Appeal of Florida, First District.
August 8, 1991.
Vance W. Kidder of Spriggs & Kidder, P.A., Tallahassee, and Clifton A. McClelland, Jr. of Potter, McClelland, Marks & Healy, P.A., Melbourne, for appellants.
David J. Russ and Richard J. Grosso of the Dept. of Community Affairs, Tallahassee, for appellee Dept. of Community Affairs.
*966 Kraig A. Conn of Florida League of Cities, Inc., Tallahassee, for appellee Florida League of Cities.
Scottie J. Butler, Gainesville, for amicus curiae Florida Farm Bureau Federation.
S. James Brainerd of The Florida Chamber of Commerce, Tallahassee, for amicus curiae Florida Chamber of Commerce.
Robert A. Butterworth, Atty. Gen., and Jonathan A. Glogau, Asst. Atty. Gen., Tallahassee, for amicus curiae The Atty. Gen. of Fla.
PER CURIAM.
Appellants,[1] who will be referred to collectively as Home Builders, appeal the final order of a hearing officer of the Department of Administrative Hearings, dismissing their petition, which challenges urban sprawl Rules 9J-5.006(3)(b)7. and 9J-5.001(2)(b)3., Florida Administrative Code, and alleged nonrule policies interpreting and applying these rules. We affirm.
In 1985, the legislature passed the Local Government Comprehensive Planning and Land Development Regulation Act, (the Act), Chapter 163, part II, Florida Statutes, which requires local governments to adopt local comprehensive plans to guide and control future land development. Section 163.3177(9) required the Department of Community Affairs (DCA) to adopt, by rule, "minimum criteria for the review and determination of compliance" of local comprehensive plans. In accordance with this directive, DCA promulgated Chapter 9J-5, Florida Administrative Code, to aid the DCA in making a determination whether a local comprehensive plan is in compliance with the statutory requirements. See § 163.3184(1)(b), Fla. Stat. The two rules in question in this appeal, 9J-5.006(3)(b)7. and 9J-5.001(2)(b)3., were adopted as part of 9J-5. Rule 9J-5.006(3)(b)7. requires that the future land use element of each plan contain one or more specific objectives that "discourage the proliferation of urban sprawl." Rule 9J-5.001(2)(b)3. requires that the infrastructure element of each plan contain one or more objectives that "address maximizing the use of existing facilities and discouraging urban sprawl." Urban sprawl is not defined in Chapter 9J-5, nor is urban sprawl expressly mentioned in the Act or Section 187.201, Florida Statutes, which adopts the state comprehensive plan.
Chapter 9J-5 was required to be submitted to the legislature before it could become effective. Accordingly, the 1986 legislature reviewed Chapter 9J-5, and thereafter passed Section 163.3177(10)(k) which provides in pertinent part:
It is the intent of the Legislature that there should be no doubt as to the legal standing of Chapter 9J-5, F.A.C., at the close of the 1986 legislative session... . The entire Chapter 9J-5, F.A.C., as amended, shall be subject to rule challenges under s. 120.56, as nothing herein shall be construed to indicate approval or disapproval of any portion of Chapter 9J-5, F.A.C., not specifically addressed herein. No challenge pursuant to s. 120.56 may be filed after July 1, 1987. Any subsequent amendments to Chapter 9J-5, F.A.C., exclusive of the amendments adopted prior to October 1, 1986 pursuant to this act, shall be subject to the full chapter 120 process... .
In compliance with the Act, Charlotte County prepared its local comprehensive plan, but the DCA rejected the plan based largely on its failure to deal with urban sprawl. Charlotte County requested a Section 120.57 hearing to determine if its plan was in compliance. The hearing was held and the issue of urban sprawl was litigated. Similarly, the Brevard County comprehensive plan was rejected by the DCA in part because of its failure to discourage urban sprawl. A Section 120.57 proceeding concerning the Brevard County comprehensive plan was scheduled for December 1989. Home Builders intervened in the Brevard County proceeding. Ultimately, DCA's rejection of the Charlotte County plan was adopted by the Administration *967 Commission. Department of Community Affairs v. Charlotte County and City of Punta Gorda, 12 FALR 2760 (March 15, 1990). The DCA and Brevard County settled their dispute.
After the Charlotte County 120.57 hearing, but before the Brevard County 120.57 hearing was scheduled, Charlotte County and Home Builders filed the present rule challenges.[2] The rule challenges were assigned to a hearing officer and the Florida League of Cities was permitted to intervene in the proceeding. Charlotte County complained that the DCA resorted to internal unpublished nonrule policies to define the terms "discourage" and "urban sprawl" and has unlawfully implemented these urban sprawl nonrule policies. Charlotte County charged that the urban sprawl rules are invalid because, as applied, they are an invalid exercise of delegated legislative authority. Charlotte County further complained that local governments are not given clear direction on what is expected in preparing plans and contended that the rules should not be grounds for rejecting a local comprehensive plan until the DCA makes rules defining "urban sprawl" and adopts criteria explicating how DCA will apply the definition to individual plans. Home Builders' challenge was similar, but their petition also contained a direct challenge to the urban sprawl rules despite Section 163.3177(10)(k), because according to Home Builders, these rules have been amended by the adoption of nonrule policies and rule challenges to amendments to 9J-5 are permitted. In their brief, Home Builders identifies the nonrule policies they are challenging: (1) to DCA the word "discourage" in the codified rules means "prevent"; (2) DCA requires high density development in compact urban areas; (3) DCA requires large lot size outside urban areas irrespective of whether an urban service area has been designated, in order to promote compact urban development and to separate urban and rural lands; (4) DCA has published a definition of "urban sprawl" which cannot be relied on; and (5) DCA will prohibit the designation in a plan of land for residential use if it exceeds the amount of land DCA allocates for residential use over the planning period.
In the spring of 1989, in a Department of Community Affairs technical memo, DCA secretary Pelham defined urban sprawl thusly:
Urban sprawl is premature, low density development that "leap frogs" over land that is available for urban development. It is not functionally related to or integrated with other development and is not in proximity to existing urban developments, facilities and services, and, as a consequence, requires public investments for infrastructure and services that are far more expensive than they would be if they were located closer to existing facilities and services.
In the same publication, Secretary Pelham opined that the effects of urban sprawl were inefficient, costly infrastructure expenditures, sterile land use developments that lack community identity and require extensive commuting by automobile, and endangered natural resources. While DCA personnel who testified at the hearing below gave variations of this definition, overall their definitions of urban sprawl were more or less consistent with Pelham's.
At the outset, it is necessary to address the issue of Home Builders' standing to bring a rule challenge. Home Builders' alleged standing is based upon their contention that as home builders, they have an interest in the effects that urban sprawl nonrule policies will have on home building  specifically their ability to determine what areas can be developed and the densities at which they can be developed. Initially, DCA disputed Home Builders' standing; however, at the conclusion of the hearing, DCA submitted a proposed recommended order in which it conceded Home Builders' standing to bring this action. The hearing officer was of the view, as are *968 we, that under established decisions of this court Home Builders lacked standing to bring the rule challenge. Board of Optometry v. Florida Society of Ophthalmology, 538 So.2d 878 (Fla. 1st DCA 1988); and Florida Dept. of Offender Rehabilitation v. Jerry, 353 So.2d 1230 (Fla. 1st DCA), cert. denied 359 So.2d 1215 (Fla. 1978). Nevertheless, the hearing officer proceeded to address the issues in this case, apparently because standing was not a contested issue. We believe the hearing officer was correct in doing this. Standing in a Florida administrative proceeding is a judicially created prerequisite based upon statutory language and is not a constitutional jurisdictional requirement; therefore, because DCA did not contest standing below or on appeal, we will proceed as did the hearing officer. See 59 Am.Jur.2d Parties, § 30 (1987).
Turning to the evidence adduced at the hearing, the testimony reflected two approaches to land development  compact urban development, and market driven development. The former uses planning tactics to discourage uncontrolled, untimely premature growth away from cities and urban service areas or urban centers which allegedly results in development not functionally related to its environment and which DCA witnesses equated with urban sprawl. The latter approach advocates development based upon market pressures and allegedly results in satellite centers away from cities and urban centers offering employment opportunities near low density residential areas and reduced commuting distances. Surprisingly, the proponents of each view argue that their respective approaches would reduce costs.
The testimony centered around what is meant by "urban sprawl", whether chapter 9J-5, and particularly the challenged rules, give sufficient guidance to local governments on what is meant by discouraging urban sprawl, and whether the directive that urban sprawl should be discouraged has any statutory basis in the Act, or the state comprehensive plan.
At this juncture, it is important to focus on what the hearing officer decided. He was asked to decide, in essence, whether DCA was applying nonrule policies which were invalid because they had not been promulgated as rules. He was not asked to, nor could he, make a ruling on the question whether urban sprawl policies are a fundamental legislative decision which could not be delegated to the DCA, nor was he asked to decide whether the Act or the state comprehensive plan delegated to the DCA the authority to make decisions regarding urban sprawl without adequate standards. Key Haven Associated Enterprises, Inc. v. Board of Trustees of the Internal Improvement Trust Fund, 427 So.2d 153 (Fla. 1982); and Department of Revenue of Florida v. Young American Builders, 330 So.2d 864 (Fla. 1st DCA 1976). Accordingly, these particular issues were not decided in the administrative proceeding below.[3]
With this in mind, we turn to the findings and conclusions of the hearing officer with which we agree. The hearing officer found that indeed, there was a consensus on the meaning of urban sprawl and that urban sprawl is:
[T]he extension of urban-type development into rural, agricultural, or other undeveloped or sparsely developed lands in a haphazard development pattern in which land uses are not functionally related to each other.
Common patterns of urban sprawl are the ribbon pattern, leapfrog pattern, and concentric circle pattern. In the ribbon pattern, development not functionally or proximately related to other non-urban development in the area extends in ribbons or strips along certain roads and away from urban development.
In the leapfrog pattern, development not functionally or proximately related to other non-urban development in the area *969 leaps from urban development so as to leave significant amounts of rural, agricultural, or other undeveloped or sparsely developed land between existing urban development and the scattered leapfrog development. The concentric circle pattern is similar except that the development not functionally or proximately related to other non-urban development in the area assumes the pattern of concentric circles, such as along rural roads bypassing an urban area, and is characteristically more exclusively low-density residential.
Next, and more importantly, the hearing officer found that DCA does not have any policies of general applicability concerning the application of the urban sprawl rules which it consistently applies to individual plans. The DCA has yet to crystallize any urban sprawl policies which it intends to apply to individual plans. He noted that the application process, which is by nature adjudicatory, demands a thorough understanding of each plan, including the data and analysis describing the characteristics of the land and existing land uses; the goals, objectives, and policies prescribing proposed land uses; and the future land use map. Indeed, he recognized that the myriad of details involved in applying the urban sprawl rules to an individual plan may preclude rulemaking, but even if theoretically possible, rulemaking in the area of application is not now practicable. In short, the alleged nonrule policies do not meet the definition of a rule, Section 120.52(16). These findings, which are conclusive of the outcome of the rule challenge, are based upon competent substantial evidence in the record. Adam Smith Enterprises, Inc. v. Department of Environmental Regulation, 553 So.2d 1260, 1274 (Fla. 1st DCA 1989).
The hearing officer found:
29. Important issues involving the application of the urban sprawl rules are emerging. One issue is the extent to which the interpretation and application of the urban sprawl rules involve other provisions of law addressing the effects of urban sprawl. Provisions of the Act, Chapter 9J-5, and the State Plan: 1) promote the efficient use of land in the development of new, and maintenance of existing, viable mixed-use communities; 2) promote the efficient provision to urban and non-urban areas of public facilities and services, such as water, sewer, roads, schools, police, fire, drainage, and other infrastructure; 3) protect natural resources; and 4) protect agricultural lands and uses. Indications that the plan fails to discourage urban sprawl include the presence, with respect to the above-described four areas, of goals, objectives and policies that are: not supported by the data and analysis; internally inconsistent; inconsistent with relevant provisions of the State Plan or applicable regional plan; or inconsistent with the relevant minimum criteria of the Act and Chapter 9J-5. Future adjudication should clarify the relationship between the definition of urban sprawl and application of the urban sprawl rules, on the one hand, and the effects or indicators of urban sprawl, on the other hand. The adjudicatory process will answer such questions as the extent to which a plan that satisfies all requirements of the Act and Chapter 9J-5, ignoring the urban sprawl rules, necessarily satisfies the urban sprawl rules.
While the hearing officer found that it was premature to require DCA to promulgate further more specific rules on urban sprawl, he noted that local governments are not without guidance about how to discourage urban sprawl in their plans. The Act, Chapter 9J-5, the state plan, applicable regional plans, and the DCA technical memo for Spring 1989, provide sources of authority for local governments.
The hearing officer noted that the model future land use element, which DCA published in May 1987, is particularly helpful in this regard. It contains specific data and analysis, goals, objectives and policies, and incorporates planning strategies that may be useful. More importantly he found that the model land use element refutes appellant's contentions that DCA is unlawfully preferring one planning theory (urban *970 containment) over another (market driven development). He found:
The model element takes a balanced approach to urban containment in which the encouragement of urban in-fill works in tandem with the allowance of planned development of areas that are sparsely developed or entirely undeveloped. While discouraging urban sprawl, the model element nonetheless establishes urban service areas beyond the boundaries of present urban areas, designates large tracts of low density residential outside the urban services areas, designates extremely low density residential and other areas designated for agricultural or other nonresidential uses, and establishes a new town center in a largely undeveloped area. By so doing, the model element simultaneously accommodates current market preferences and focuses development activity that, if unplanned, would perpetuate patterns of sprawling development in contravention of the Act, Chapter 9J-5, and the State Plan.
Having found, based upon competent substantial evidence, that in fact DCA was not imposing invalid nonrule policies in interpreting and applying the urban sprawl rules, the hearing officer concluded, and we agree, that it was not necessary to address the applicability of Section 163.3177(10)(k) to Home Builders' petition.[4]
In sum, we agree with the hearing officer that at present, the proper forum for affected persons to challenge any alleged nonrule policies concerning the urban sprawl rules is a Section 120.57 hearing, at which DCA will have to prove and justify its policies. At the hearing, DCA will be required to establish its policies by expert testimony, documentary opinions, or other evidence appropriate to the nature of the issues involved and must expose and elucidate its reasons for its discretionary action. St. Francis Hospital v. Department of Health and Rehabilitative Services, 553 So.2d 1351, 1354 (Fla. 1st DCA 1989). As the hearing officer concluded, following the hearing, the Administration Commission will issue a final order determining whether DCA has shown that its policies were within the discretion delegated to DCA and whether any deviations from prior agency practices have been adequately explained. An aggrieved party may obtain judicial review of the final order, and in this manner, the courts, the Act, and Chapter 120 serve as effective safeguards against the alleged "absolute and unbridled power" of DCA.
The order appealed is AFFIRMED.
SMITH, NIMMONS and ZEHMER, JJ., concur.
NOTES
[1] Florida Home Builders Association, Inc. is an association of mostly residential home builders with over 18,000 members. The Home Builders and Contractors Association of Brevard, Inc. has over 800 members, who are home builders particularly interested in Brevard County.
[2] While Charlotte County participated in the rule challenge below, Charlotte County did not appeal the hearing officer's adverse order.
[3] Home Builders has made an inartful unlawful delegation argument in this appeal, which we decline to address because they have failed to demonstrate standing. See Southeast Volusia Hospital District v. State Department of Insurance, 432 So.2d 592, 598 (Fla. 1st DCA), reversed on other grounds, 438 So.2d 815 (Fla. 1983).
[4] We make no comment on the hearing officer's gratutious remark that Section 163.3177(10)(k) deprives DOAH of jurisdiction over any Section 120.56 challenge to the urban sprawl rules themselves.