ORFINGER, J.
 

 Citrus County appeals a non-final order determining that it had “inordinately burdened” real property owned by Halls River Development Inc., as that term is used in the Bert J. Harris, Jr. Private Property Rights Protection Act, section 70.001, Florida Statutes (2005). The County contends that the trial court erred in finding that Ordinance 2002-A-10 (“the Ordinance”) inordinately burdened Halls River’s use of its real property; that Halls River had a reasonable, investment-backed expectation to develop its property as a multifamily condominium; or that the Ordinance burdened Halls River’s existing use or vested right to use the property for a multifamily condominium resort. The County further argues that the trial court erred in holding that Halls River timely asserted its Harris Act claim. For the following reasons, we reverse.
 
 [1]
 

 BACKGROUND
 

 Halls River purchased approximately eleven acres of real property located in Citrus County in January 2001 with the intention of building a condominium complex. At issue is the proposed development of that property, and more specifically, the interrelationship between the County’s Comprehensive Land Use Plan and its Land Development Code.
 

 The Local Government Comprehensive Planning and Land Development Regulation Act, Chapter 168, Part II, obligates local governments to adopt comprehensive land use plans to guide and control future land development.
 
 Galaxy Fireworks, Inc. v. City of Orlando,
 
 842 So.2d 160, 165 (Fla. 5th DCA 2003);
 
 Home Builders & Contractors Ass’n of Brevard, Inc. v. Dep’t of Cmty. Affairs,
 
 585 So.2d 965, 966 (Fla. 1st DCA 1991). By law, each comprehensive plan must be reviewed every seven years in an Evaluation and Appraisal Report (“EAR”). The EAR is intended to assess the progress made in implementing the comprehensive plan.
 
 See
 
 § 163.3191, Fla. Stat. (2005). A comprehensive plan may also be amended through this process if the amendment is approved by the Florida Department of Community Affairs (“DCA”). The land development code is the document that implements the comprehensive plan. If there is a conflict between the comprehensive plan and the land development code, the comprehensive plan prevails.
 
 See
 
 § 163.3194, Fla. Stat. (2005).
 

 In 1989, the Board of County Commissioners (“the Commission”) adopted the County’s Comprehensive Plan (“the Plan”)
 
 *416
 
 in compliance with Chapter 163, after a series of public meetings. Prior to 1997, both the County’s Plan and its Land Development Code (“LDC”) were consistent, designating the property at issue as “Mixed Use” (“MXU”). This was a “catch all” multiple-use category, which permitted, among other uses, a multifamily condominium. Much of the other property in the vicinity of Halls River’s property was designated both in the Plan and the LDC as Low Intensity Coastal and Lakes (“CL”), restricting development to one unit per twenty acres of real property. However, the property contiguous to Halls River’s property was, and remains, a 360-unit R.V./mobile home park (of which the property was once a part), a restaurant and lounge. Protected wetlands and salt marshes are located across the Homosassa River from the Halls River property.
 

 As required by law, the County prepared an EAR in 1996, and, based on that report, submitted various Plan changes to the DCA. After the DCA approved the 1996 EAR, the Commission adopted the 1996 EAR amendment in 1997. That Plan amendment included changing the Halls River property classification from MXU to CL. However, while the County changed the Halls River property classification from MXU to CL in the Plan and on the Generalized Future Land Use Map (“GFLUM”), the map that shows future land uses under the Plan, it unfortunately did not update the property’s designation in the LDC or the LDC zoning maps. Those documents continued to reflect that the property was zoned MXU. The LDC and its maps were not amended because the County believed, erroneously as all concerned would later discover, that the 1996 EAR amendment allowed it to continue to approve development at higher densities in the areas reclassified from MXU to CL. That mistaken belief would be the basis for the difficulties that would later ensnare the parties.
 

 F. Blake Longacre, an experienced real estate developer, is the principal owner and president of Halls River. He wanted to build a condominium project in the Ho-mosassa River area and learned about the property from a local real estate broker. He determined that according to the LDC zoning map, the property was suitable for this use. Nonetheless, before entering into a contract to purchase the property, Mr. Longacre contacted the County Development Services Staff to confirm that Halls River could build its proposed project on the property. The County staff assured Mr. Longacre that development of multifamily condominiums was a proper use for the property. Mr. Longacre was further assured that if Halls River met all the LDC requirements,
 
 ie.,
 
 setbacks, environmental concerns, etc.; obtained the necessary permits from the U.S. Army Corps of Engineers (“USACE”) and the Southwest Florida Water Management District (“SWFWMD”); and obtained the approval of the Commission after a public hearing, the project could be built.
 

 In February 2000, Halls River entered into a contract to purchase the property. The contract included a due diligence period of 160 days to allow Halls River to “make inquiries to governmental authorities” to determine if the property was suitable for its intended purpose. Halls River retained a surveyor and an engineer to determine if a suitable project could actually be built on the property in compliance with the LDC and environmental concerns. Although the County staff and Halls River disagreed about the number of units that could be constructed on the property, the County staff agreed that multiple units could be built on the property if properly configured in conformity with the LDC.
 

 
 *417
 
 Halls River closed on the property in January 2001. To address the County staffs concerns, Mr. Longacre continued to amend the project application and eventually got the County staffs approval as to the number of units as well as approvals from the USACE and the SWFWMD. On February 12, 2002, despite considerable public opposition, the Commission approved Halls River’s application by a 3-2 vote.
 

 The project’s opponents made known their belief that Halls River’s application was inconsistent with the Plan’s CL designation for the property, and was unlawful, irrespective of the LDC’s MXU designation of the property. They threatened litigation and shortly after the Commission’s action, filed several lawsuits against the County in the trial court, challenging the project’s approval.
 
 [2]
 
 In November 2002, the trial court overturned the Commission’s approval of the project, concluding that the Plan, which had designated the property as CL since 1997, controlled over the LDC’s MXU designation. The County’s petitions for writs of certiorari in this Court were denied.
 
 See Citrus County v. Save the Homosassa River Alliance,
 
 5D02-3824 (Fla. 5th DCA Apr. 19, 2003);
 
 Citrus County v. Richards et al.,
 
 5D02-3820 (Fla. 5th DCA May 19, 2003) (unpublished orders).
 

 In the meantime, the County adopted the Ordinance, effective April 23, 2002, which conformed the LDC and the zoning maps to the Plan. However, recognizing that Halls River might have some vested rights, the Ordinance expressly exempted the Halls River property from its operation. It is this Ordinance that Halls River asserts created an inordinate burden on its development rights.
 

 After this Court denied the County’s requests for review of the trial court orders overturning the Commission’s approval of the project, Halls River resubmitted its application to the County. Halls River and the County believed that when the trial court overturned the project approval, the parties were restored to the position that they enjoyed prior to the Commission’s action, thereby, allowing Halls River to reapply. In response to the resubmitted application and the County’s exclusion of the property from the operation of the Ordinance, the project’s opponents again sought relief in the trial court, this time by filing a petition for a writ of prohibition. The petition sought to prohibit the County from approving any project on the property not authorized by the CL designation. The court granted prohibition, ruling that the Halls River project, as originally approved, was a violation of law. The trial court explained that the County’s approval of the project was “illegal ... because [the project] ... is inconsistent with the Citrus County Comprehensive Plan” and “proposes a density more intense than that allowed by the Comprehensive Plan.” The County then advised Halls River that because its resubmitted application was inconsistent with the Plan, it would not be considered.
 

 Halls River notified the County of its claim for compensation under the Harris Act in April 2003. The County responded by issuing a “ripeness decision,” identifying the allowable uses of the property and informing Halls River that it would “effectuate no change in its actions with respect to this matter and w[ould] not extend an offer of settlement.”
 

 
 *418
 
 Halls River then sued the County, alleging that the Ordinance inordinately burdened its property and sought compensation under the Harris Act. The complaint also asserted claims for declaratory relief pursuant to section 86.011, Florida Statutes (2005), and equitable estoppel. Specifically, the Halls River’s complaint alleged:
 

 Count I
 

 Harris Act
 

 [[Image here]]
 

 6. Halls River’s real property for many years had been zoned MXU under the Plan and the County’s LDC.
 

 7. Prior to April 24, 2002, Citrus County Ordinance No. 2002-A-10, as amended, the County’s Plan and LDC permitted the Plaintiffs real property to be developed with an economically viable commercial, multi-family or residential land use densities of up to 20 units per acre.
 

 8. That the Citrus County Ordinance No. 2002-A-10 contains new arbitrary, unreasonable and restrictive land use regulations and inordinately burdens the Plaintiffs real property.
 

 9. That these specific actions of the County[] (Ordinance No. 2002-A-10) described above have directly restricted or limited use of the Halls River’s real property such that Halls River is permanently unable to obtain Halls River’s reasonable investment expectations for the use of Halls River’s real property as defined by F.S. 70.001(3)(b) or alternatively such that Halls River is left with existing “uses” as defined by F.S. 70.001(3)(b) that are unreasonable with the result that Halls River is permanently placed in a position of having to bear a disproportionate share of a burden imposed for the good of the public which, in fairness, should be borne by the public at large.
 

 10.That specific actions of Citrus County alleged above inordinately burden, restrict, and limit the private property rights of the Plaintiff and unfairly affect Halls River’s real property.
 

 [[Image here]]
 

 Count II
 

 Equitable Estoppel
 

 [[Image here]]
 

 21. On February 21, 2002, The Citrus County Board of Commissioners, at a scheduled meeting ... approved a development plan for Halls River to develop Halls River Retreat, a shared-ownership condominium consisting of 54 units located in 18 buildings.
 

 22. In good faith reliance on the County approval referenced in paragraph 21 above, Halls River expended significant sums of money, incurred significant obligations, and substantially changed its position to its detriment such that it would be manifestly unfair and unjust to allow Halls River to forfeit or lose these monies as a result of the County’s actions set forth above.
 

 23. The County’s amendments to the Plan and the LDC which deprived Halls River of its original, approved development order was [sic] arbitrary and capricious, and designed specifically to deprive Halls River of its approved development order and to prevent Halls River from constructing its planned 54 unit shared-ownership condominium on its real property.
 

 After a hearing on largely uncontrovert-ed facts, the trial court determined that the County’s actions inordinately burdened Halls River’s property, finding:
 

 The County does not deny that its agents consistently and unequivocally
 
 *419
 
 assured Owner that the County regulations would permit a development such as Owner intended, in fact[,] the County staff involved in the application process so candidly admitted. And the staff knew Owner was relying on their expertise. Mr. Maidhoff, who incidentally was offered by the County and received by the court as the County’s expert on its Comprehensive Plan and Land Development LDC, testified that it is not uncommon for owners to do so. It would be unreasonable for an owner not to rely on county staff. And these were not representations relating to law. They were statements of fact. Our regulations require this, comply and get Commission approval, and you can build your project.
 

 The County asserts that the [trial court] ... ruling [overturning the Commission’s approval of the project] should not be construed as a belated application of the coastal lakes zoning but should relate back to the 1996/1997 amendment to the Comprehensive Plan[,] prohibiting Owner[’]s reliance from the beginning. The court finds this position entirely inequitable. When the County itself was in the dark, the court will not hold that Owner should have carried a flashlight. Neither could see (or should see) it coming and it is the County, as between the two, that should bear the consequences.
 

 Owner relied on these representations, changed its position and suffered damages as a result of it. Owner purchased the property, hired an engineer and surveyor, drew plans and altered plans at the County’s insistence. The estimated cost of this reliance was one and a half million dollars. The County claims these damages are not recoverable under a Bert Harris action. Owner is not seeking such damages; this was shown only to establish reliance. The damage sought is the diminution of value to its property before and after its permit was withdrawn on a regulation passed for the public good.
 

 At the hearing, Owner’s appraiser testified to a substantial loss suffered by Owner because the County withdrew its permit after the de novo ruling. Any remaining possible use of the property, the appraiser testified, would be inadequate to prevent the inordinate burden suffered by Owner. Although the County put on an appraiser, he did not appraise the property before and after the permit’s withdrawal; he merely appraised the Owner’s appraisal. The basic fact is that Owner was found to have met the Comprehensive Plan requirements, the Land Development LDC, received the approval of the Army Corp., and the SWFWMD, and obtained a ruling by the County Commission after a public hearing that it was entitled to build a 56 unit interval ownership project. This was taken away by the belated application of a zoning restriction of one unit per twenty acres passed for the public good. Owner is now limited to a single unit on eleven acres of riverfront property. This is an inordinate burden under the Bert Harris Act and the public should share the burden.
 

 This appeal followed.
 

 ANALYSIS
 

 The Harris Act, enacted in 1995, created a new cause of action allowing property owners who suffer inordinate regulatory burdens to existing or reasonably foreseeable land uses to be compensated by the government entity creating the burden. § 70.001(1), (2), (5)(a), Fla. Stat. (2005). The law focuses on protecting real property owners’ rights to existing uses and vested rights to specific uses of their property. It creates a statutory remedy “when a new
 
 *420
 
 law, rule, regulation or ordinance ..., as applied, unfairly affects real property” by inordinately burdening an existing use or a vested right to use real property. § 70.001(1), Fla. Stat. (2005). The inordinate burden must be to such an extent that the property owner is permanently unable to attain the reasonable investment-backed expectations for the existing use (or vested right) of the property as a whole. § 70.001(3)(e), Fla. Stat. (2005);
 
 Palm Beach Polo Inc. v. Village of Wellington,
 
 918 So.2d 988, 995 (Fla. 4th DCA 2006).
 

 A Harris Act claim must be presented within one year from the time the law or regulation is first applied by the governmental entity to the property at issue. § 70.001(11), Fla. Stat. (2005). At least 180 days before filing a lawsuit, written notice of the claim must be given to the appropriate governmental entity. § 70.001(4)(a), Fla. Stat. (2005). When the presuit notice is received, the government has 180 days to consider its options, which include retracting or modifying its action, taking no action, or granting relief in a variety of ways and making an offer to settle. § 70.001(4)(c), Fla. Stat. (2005). Before the expiration of this period, unless a settlement offer is accepted by the property owner, the governmental entity is required to issue a written “ripeness” decision, identifying the allowable uses for the property. § 70.001(4)(a), (5)(a), Fla. Stat. (2005). “The ripeness decision, as a matter of law, constitutes the last prerequisite to judicial review, and the matter shall be deemed ripe or final for the purposes of the judicial proceeding created by this section, notwithstanding the availability of other administrative remedies.” § 70.001(5)(a), Fla. Stat. (2005). If the governmental entity maintains its earlier decision, the property owner may file a claim for damages in the trial court. § 70.001(5)(b), Fla. Stat. (2005). Upon compliance with the procedural requirements of the Harris Act, the court must determine whether an existing or vested use exists and whether the regulation has “inordinately burdened” the real property. If the court so finds, a jury determines the amount of damages suffered by the property owner. § 70.001(6), Fla. Stat. (2005).
 

 The County argues that the Ordinance did not inordinately burden Halls River’s property, as it specifically exempted the property. More specifically, the County contends that the only action it took regarding the property was in 1997, when it amended the Plan and adopted the 1996 EAR amendment, eliminating the MXU future land use designation from the Plan, while retaining the MXU zoning designation in the LDC. For this reason, the County argues that as the Harris Act only applies to “new” laws or regulations affecting real property and bars any Harris Act claim presented more than one year after the application of the new law or regulation to the affected property, the presuit notification would have been required in 1998. The County concludes that the Ordinance did not eliminate any development rights that Halls River had in the MXU designation because, as the trial court found, the MXU rights were eliminated by its 1997 adoption of the 1996 EAR amendment.
 

 Before proceeding further, an understanding of the relationship between a comprehensive land use plan and zoning regulations is important. A local comprehensive land use plan is a statutorily mandated legislative plan to control and direct the use and development of property within a county or municipality. § 163.3167(1), Fla. Stat. (2005);
 
 Machado v. Musgrove,
 
 519 So.2d 629, 631-32 (Fla. 3d DCA 1987). The comprehensive plan is similar to a constitution for all future development
 
 *421
 
 within the governmental boundary.
 
 Machado,
 
 519 So.2d at 632. Zoning, or, in this case, the County’s LDC, is the means by which the Plan is implemented.
 
 See City of Jacksonville v. Grubbs,
 
 461 So.2d 160 (Fla. 1st DCA 1984). Zoning involves the exercise of discretionary powers within limits imposed by the comprehensive plan. A zoning action that is not in accordance with the comprehensive plan is unlawful.
 
 Machado,
 
 519 So.2d at 632. Once a comprehensive plan has been adopted pursuant to Chapter 163, Part II, “all development undertaken by, and all actions taken in regard to development orders by, governmental agencies in regard to land covered by such plan” must be consistent with that plan. § 163.3194(l)(a), Fla. Stat. (2005);
 
 see also
 
 § 163.3164(7), Fla. Stat. (2005).
 

 In its complaint below, and on appeal, Halls River recognizes that the Ordinance expressly exempted its proposed development. However, Halls River claims that the “impact” of the trial court’s prohibition judgment invalidating the exemption, caused its property to be “inordinately burdened.” Halls River posits that the Ordinance directly restricts or limits its use of the property, and for the first time applied the 1996 EAR amendments.
 

 The terms “inordinate burden” or “inordinately burdened” are defined in the Harris Act to mean a specific action by a governmental entity that directly restricts or limits the use of real property. To be actionable, the “inordinate burden” must be such that the property owner is permanently unable to attain the reasonable, investment-backed expectation for the existing use of the real property or a vested right to a specific use of the real property with respect to the real property as a whole. A property owner is also “inordinately burdened” if the property owner is left with existing or vested uses that are unreasonable, so that the property owner permanently bears a disproportionate share of a burden imposed for the good of the public, which in fairness should be borne by the public at large. § 70.001(3)(e), Fla. Stat. (2005). The existence of a “vested right” is determined by applying the principles of equitable estop-pel and substantive due process under statutory or common law. § 70.001(3)(a), Fla. Stat. (2005).
 

 At the time Halls River purchased the property in 2001, the “actual, present use” of the property was as a single family residence. However, Halls River argues that its intended use of the property for a multifamily condominium fell within the statutory definition of “existing use,” as such a use for the property was reasonably foreseeable and nonspeculative, suitable for the property, and was compatible with adjacent land uses. We are not persuaded by that argument, as Halls River’s intended use of the property for a condominium was not reasonable given the Plan’s CL designation for the property. Even though the County candidly admits that its staff misinformed Halls River regarding the allowable uses of the property, Halls River, like the County, should have known that the property’s CL designation in the Plan would control over the LDC’s MXU designation.
 

 Halls River also failed to establish a vested right to its intended use of the property based on a theory of equitable estoppel despite the County’s erroneous advice about the property’s permitted uses. The doctrine of equitable estoppel may be invoked against a governmental body when a property owner (1) relying in good faith (2) upon some act or omission of the government (3) has made such a substantial change in position or incurred such extensive obligations and expenses that it would be highly inequitable and unjust to
 
 *422
 
 destroy the rights that the owner has acquired.
 
 Verizon Wireless Pers. Commc’ns, L.P. v. Sanctuary at Wulfert Point Cmty. Ass’n,
 
 916 So.2d 850, 856 (Fla. 2d DCA 2005). However, estoppel should be invoked against the government only in exceptional circumstances.
 
 Watson Clinic, LLP v. Verzosa,
 
 816 So.2d 832, 834 (Fla. 2d DCA 2002). And, most importantly, the doctrine of estoppel does not generally apply to transactions that are forbidden by law or contrary to public policy.
 
 Montsdoca v. Highlands Bank & Trust Co.,
 
 85 Fla. 158, 95 So. 666, 668 (1923);
 
 Dade County v. Gayer,
 
 388 So.2d 1292, 1294 (Fla. 3d DCA 1980). That is the case here as the Plan, which enjoys legal primacy regarding allowable land uses, prohibited the property’s use as a multifamily condominium.
 

 In the final analysis, Halls River’s claim fails for several reasons. Initially, the Ordinance clearly did not create an inordinate burden on Halls River’s property since the Ordinance exempted the property. The inordinate burden, if one exists, was created by the 1996 EAR amendment and not by the Ordinance passed in 2002. As a result, the Harris Act claim was untimely. Once the Plan, as amended, was approved by the DCA in 1997, the County was without discretion to undertake development actions inconsistent with it. § 163.3194, Fla. Stat. (2005). Because the Plan, as amended, prohibited construction of multifamily dwellings on the property, Halls River cannot utilize the doctrine of equitable estoppel to compel the County to issue the necessary approvals for the project, despite the County’s willingness to do so.
 

 Further, and contrary to the trial court’s determination, Halls River was not “found to have met the Comprehensive Plan requirements.... ” This case is based entirely on the fact that Halls River’s project does not comply with the Plan. As a result of the litigation brought by opponents of the project, it became clear that the Commission’s approval of the project was unlawful because it directly contravened the property’s CL designation in the Plan. The County acted beyond its lawful authority in approving the project. Inasmuch as the property maintained the CL designation since 1997, well before Halls River bought the property, Halls River never had a lawful right to the proposed use for a multifamily dwelling, the County staffs misadvice notwithstanding.
 

 With some persuasive force, Halls River argues that since the Harris Act only allows as applied challenges, the mere enactment of a statute, ordinance or plan of general application such as the Plan and the EAR amendments, should not trigger the accrual of a Harris Act claim.
 
 See generally
 
 Susan L. Trevarthean,
 
 Advising the Client Regarding Protection of Property Rights: Harris Act and Inverse Condemnation,
 
 78 Fla. B.J. 61 (2004). If correct, Halls River’s claim might be timely, as a Harris Act claim can be asserted within one year from the time the new law, rule, or plan is first applied to the property. Halls River argues that until an actual development plan is submitted, the impact of a governmental regulation cannot be determined. We agree that there may be some instances when the impact of a governmental regulation cannot be determined prior to the submission of an actual development plan. For example, if a comprehensive plan contains a clear height limit, the impact on a given parcel of property can immediately be determined. On the other hand, the impact of a generally applicable development standard discouraging urban sprawl may not be as readily apparent. But here, the impact of the CL designation of the property was readily ascertainable in 1997,
 
 ie.,
 
 
 *423
 
 one housing unit per twenty acres of land. That the County and Halls River misper-ceived the legal effect of the 1996 EAR amendment is of no legal significance in determining the timeliness of Halls River’s claim.
 
 [3]
 

 Furthermore, contrary to Halls River’s argument, the County’s actions were not based on a unilateral mistake of fact. While Halls River relied on the County’s affirmative representations,
 
 see Branca v. City of Miramar,
 
 684 So.2d 604 (Fla.1994), its reliance was based on the County’s misstatements of law. As the trial court recognized in its order, the County mistakenly believed and relayed to Halls River that it could lawfully “retain the authority to authorize a MXU PD overlay for a project in conformance with its amended ... Plan,” which “prevented [Halls River] from developing its property in accordance with its plans or, for that matter, developing its property in any fashion other than as a single family residential unit ...,” but that neither Halls River nor the County could have predicted the “belated application of the coastal lakes zoning.” Even if the County’s mistake is considered a mistake of fact, it was a mutual mistake of fact, as both the County and Halls River believed that the County had the authority to approve greater density than permitted in the property’s CL zoning under the Plan.
 
 [4]
 
 In such circumstances, equitable estoppel will not lie.
 
 See, e.g., Nelson Richard Adver. v. Dep’t of Transp.,
 
 513 So.2d 181, 183 (Fla. 1st DCA 1987) (ruling that equitable estoppel will not lie for permit issued contrary to law as result of mutual mistake of fact).
 

 We recognize that almost universally, the result in this case will be seen as unduly harsh. There is no doubt that Halls River was misled to its detriment by the County’s unintentional misadvice. However, by its express terms, the Harris Act requires the court to determine when the new law or regulation, as first applied, unfairly affected the property and requires a claim to be asserted within one year thereafter. On the facts presented in this case, it is clear that the adverse impact was caused in 1997 when the Plan changed the MXU designation to CL. We are not at liberty to modify the statutory scheme the Legislature created to remediate an unfair regulatory burden, though we recognize the equities clearly favor Halls River.
 
 See Gayer,
 
 388 So.2d at 1294 (observing that “[w]hile at first blush it seems that the application of the rule [prohibiting relief based on equitable estopped] may be harsh, it would be inconceivable that public officials could issue a permit, either inadvertently, through error, or intentionally, by design, which would sanction a violation” of law).
 

 For these reasons, we reverse the non-final order, which determined that the
 
 *424
 
 County had inordinately burdened Halls River’s real property.
 

 REVERSED.
 

 SAWAYA and LAWSON, JJ., concur.
 

 [1]
 

 . This Court has jurisdiction pursuant to Florida Rule of Appellate Procedure 9.130(a)(3)(c)(viii).
 

 [2]
 

 . Halls River intervened in the trial court actions, and was a party in the proceedings before this Court.
 

 [3]
 

 . Halls River argues that as a remedial statute, the Harris Act should be liberally construed in favor of granting access to the legislatively provided remedy.
 
 See generally The Golf Channel v. Jenkins,
 
 752 So.2d 561, 565-66 (Fla.2000). While Halls River is correct that remedial statutes are liberally construed in favor of access, Florida law is well settled that ambiguity is a prerequisite to judicial construction, and in the absence of ambiguity the plain meaning of the statute prevails.
 
 Martin County v. Edenfield,
 
 609 So.2d 27, 29 (Fla.1992);
 
 Holly v. Auld,
 
 450 So.2d 217, 219 (Fla. 1984). We cannot construe the statute to create rights of action not within the intent of the lawmakers, as reflected by the language employed in the statute.
 
 Klepper v. Breslin,
 
 83 So.2d 587, 592 (Fla.1955);
 
 Nolan
 
 v.
 
 Moore,
 
 81 Fla. 594, 88 So. 601, 603. (1920).
 

 [4]
 

 . The trial court recognized this mutual mistake, noting in its order, ”[t]his seems to be a case where both parties acted reasonably and in good faith but that something just went wrong. The shame is that one has to lose.”