GRIFFIN, J.
Save the Homosassa River Alliance, Inc., James Bitter, Rosemary Rendueles, and Priscilla Watkins [collectively “Plaintiffs”] appeal the trial court’s order dismissing, with prejudice, their suit against Citrus County, Florida [“County”] and Ho-mosassa River Resort, LLC [“Resort”] on the ground that they lack standing.
Resort owns property adjacent to the Homosassa River [“River”] in Old Homo-sassa, Florida. The Homosassa River is an Outstanding Florida Waterway and an essential manatee habitat.[1] There are two buildings on Resort’s site, containing fifteen residential condominium units. Resort applied to the County for a land development code atlas amendment “to allow the development and redevelopment of 87 condominium dwelling units, retail space, amenities and parking” on this property. The project would result in the construction of four four-story residential structures. On July 11, 2006, Citrus County’s Board of County Commissioners enacted Ordinance No. 2006-A13, which approved Resort’s application and amended the County’s land development code to reflect the approval.
Plaintiff Alliance is a not-for-profit corporation “committed to the preservation and conservation of environmentally sensitive lands and the wildlife in and around the Homosassa River and in Old Homosas-sa, Florida.” Plaintiffs Bitter, Rendueles, and Watkins are individuals who own property in the area. On August 10, 2006, Plaintiffs filed this suit against the County, pursuant to section 163.3215, challenging the County’s approval of Resort’s application on the ground that it is inconsistent with the County’s Comprehensive Land Use Plan, Citrus County Ordinance No. 89-04, as amended. On November 9, 2006, before the initial complaint was served on the County, Plaintiffs filed an Amended Complaint.
Resort was allowed to intervene in the dispute and the County filed a motion to dismiss, arguing that the Plaintiffs had failed to plead sufficient facts to establish standing. The trial court agreed and dismissed Plaintiffs’ complaint, -with twenty days to amend.
*332 Plaintiffs filed their Second Amended Complaint against both the County and Resort, to which the County and Resort responded by filing a joint motion to dismiss. In their joint motion to dismiss, the County and Resort alleged that Plaintiffs had failed to establish standing because they had not sufficiently alleged (1) “any interest that exceeds in degree that of the general community,” (2) “harm to such interests over and above that of their neighbors,” or (3) “any nexus between the alleged comprehensive plan violations and the interests of the parties.”[2]
The trial court heard arguments on the County and Resort’s joint motion. At the hearing, Resort and the County essentially reiterated the points they had raised in their written motion and urged that the dismissal of the Second Amended Complaint be with prejudice. Plaintiffs argued that section 163.3215 gave affected citizens significantly enhanced standing to challenge the consistency of development decisions and that their allegations were sufficient to establish standing under this liberalized standard.
On about July 2, 2007, the trial court dismissed the Second Amended Complaint with prejudice, concluding that Plaintiffs had failed to sufficiently allege that their interests were adversely affected by the project in a way not experienced by the general population and because of insufficient “nexus” allegations. The trial court observed that “[tjhere are no allegations that the county-approved plan permits improper runoff into the river or that the proposed development will itself (other than by adding people to the mix) adversely affect the quality of water or access to the river.” Additionally, the trial court noted that “[t]here is no indication that residents living in this proposed project would add any more burden to the streets, storm drainage, river crowding, etc. than residents living elsewhere in the city.”
Plaintiffs filed a motion for rehearing on July 11, 2007. In the motion for rehearing, Plaintiffs asserted that the trial court’s analysis was not within the statute. They also objected that the trial court’s dismissal “with prejudice” at that stage of the proceedings was premature and contrary to the existing case law. The trial court concluded that Plaintiffs had been given “ample opportunity to show standing if they could” and that they would not be helped by further delay. The trial court denied Plaintiffs’ motion for rehearing.

The Second Amended Complaint

Plaintiffs’ Second Amended Complaint contains lengthy allegations in support of their standing to bring this suit. The complaint begins by introducing each of the plaintiffs (Alliance, Bitter, Rendueles, and Watkins). Alliance is a not-for-profit corporation committed to the preservation of the lands and the wildlife in and around the Homosassa River and Old Homosassa, Florida. The complaint explains that the group has “embarked on a specific and focused course” to protect the River from problems associated with improper and ineffective storm water management systems, overpopulation of the lands adjacent to the River, destruction of wetlands surrounding the River, degradation of the River’s water quality, and excessive boat traffic upon the River. The group con *333 ducts seminars to educate the area’s residents about the River and how to preserve it. One of the Alliance’s main objectives has been “the orderly development and preservation of the character of Old Homo-sassa.” Members of the group use the River for both educational and recreational purposes; have invested substantial effort and funds to protect and preserve the River and its endangered manatees; and have served on the Old Homosassa Area Redevelopment Plan steering committee.
The complaint alleges that Bitter is an active Alliance member who owns property about three miles from Resort’s site. He is conscious of governmental actions that affect the health of the Homosassa River and participates actively in public conversations regarding development of the area. Bitter fishes in the River, frequently boats along it, and often visits its shores “to admire the beauty and wonder of the River and its wildlife.” Additionally, Bitter receives potable water from the Homosas-sa Special Water District, fire protection from the County’s fire department, police protection from the County’s Sheriffs Department, and emergency services by Nature Coast EMS. Finally, it is alleged that in the event of a natural disaster or a threat of a natural disaster, Bitter would have to evacuate his property via West Fishbowl Drive, which is a two-lane road in Homosassa. “West Fishbowl Drive ... is along the evacuation route for [Resort’s] property....”
Rendueles owns canal-front real property less than a mile from Resort’s site.[3] Rendueles worked on the County’s Old Homosassa Overlay steering committee and actively participated during the County’s public hearings on Resort’s application. Additionally, it is alleged that Ren-dueles “enjoys the beauty of nature by traveling down the Homosassa River and walking and bicycling along the streets in Old Homosassa.” She often visits the River’s shores “to admire the beauty and wonder of the River and its wildlife.” Rendueles receives potable water from the Homosassa Special Water District, fire protection from the County’s fire department, police protection from the County’s Sheriffs Department, and emergency services by Nature Coast EMS. In the event of a natural disaster or a threat of a natural disaster, Rendueles would evacuate her property via W. Yulee Drive, which is a two-lane road in Homosassa.
Watkins owns real property within Ho-mosassa, Florida. She participates in Alliance’s activities and actively participated during the County’s public hearings on Resort’s application. Watkins frequently kayaks on the River; bicycles along W. Halls River Road and W. Fishbowl Drive; and enjoys walking down Old Homosassa’s uncrowded streets and roads. Watkins receives potable water from the Homosassa Special Water District, sewer services from Citrus County, fire protection from the County’s fire department, police protection from the County’s Sheriffs Department, and emergency services by Nature Coast EMS. In the event of a natural disaster or a threat of a natural disaster, Watkins would evacuate her property via W. Halls River Road, a two-lane road in Homosassa, which is along the evacuation route for Resort’s property.
Plaintiffs allege that “[b]ecause of the County’s adoption of a development order which is inconsistent with its adopted Comprehensive Plant,] [Plaintiffs] will suffer an adverse effect to their interests *334 furthered by the local government comprehensive plan.... ” In paragraph 27, Plaintiffs generally list protected interests that they claim will be adversely affected by the County’s approval. Specifically, Plaintiffs allege:
The Alliance and Property Owners, including the members of the corporation, will suffer adverse effects to interests protected or furthered by the adopted Plan, as amended, including but not limited to their property interests, their interest in protecting and maintaining the existing water quality of the Homo-sassa River, their interest in protecting the endangered Manatees, their interest in sufficient water and wastewater infrastructure, their interests in efficient and equitable distribution of land uses in the area, their interests in reasonable investment-backed expectations in their area, their interests in land use, their interests in preserving the character of Old Homosassa, their interests related to health and safety, including the safety and efficiency of recreation facilities and streets, police and fire protection, densities or intensities of development, including the compatibility of adjacent land uses, their interest in environmental or natural resources and their interest in wetland preservation.
In paragraphs 9 through 12, Plaintiffs allege how the harm they would each suffer “exceeds the harm caused to the public in general.” With regard to Alliance, Plaintiffs allege:
12). Alliance will be harmed to a degree that exceeds the harm caused to the public in general because of the Alliance’s investment of resources and volunteer activities to protect the health and welfare of the Homosassa River and to encourage environmentally sound development practices around the Homo-sassa River. Its tireless efforts to educate the public and to encourage clean and environmentally sound development will be for naught if the County continues to allow development that is inconsistent with the goals and objectives of its Comprehensive Plan.
With respect to each of the individual plaintiffs, Plaintiffs allege that Resort’s proposed development activities would increase the number of people in the area and, accordingly, increase demands relating to public services, evacuation, traffic, and infrastructure.[4] It is alleged that, given their proximity to “the project and given [their] use of the same water system, roadway system ... waterway system,” and in the case of Watkins, sewer system, “[Plaintiffs] will suffer harm to a greater degree than that of the public in general.” Plaintiffs additionally allege that Bitter would “be harmed to a degree that exceeds the harm caused to the public in general” because of his participation in the local government process and his volunteer efforts to preserve and protect the River; that Rendueles would “be harmed to a degree that exceeds the harm caused to the public in general” due to her proximity to the development, her location in the Coastal High Hazard Area, and her location within the Old Homosassa Redevelopment Area; and that Watkins would “be harmed to a degree that exceeds the harm caused to the public in general” because of her proximity to the development, her location within the Coastal High Hazard Area, her use of the River, and her active use of the roads and streets within Old Homosassa.
*335 Finally, the complaint contains allegations concerning the interests the comprehensive plan is intended to protect and how Resort’s proposed project is inconsistent with the plan. Plaintiffs allege that the plan’s provisions are intended to:
a) Preserve, protect, and restore County’s natural resources....
b) Protect and maintain the water quality of the ... Homosassa ... [River]....
c) Provide the GFLUM be recognized as the primary document used by County in land use regulation and in guiding future growth.
[[Image here]]
e) Provide that where County’s LDC[5] conflicts with or overlaps other regulations, whichever imposes the more stringent restrictions shall prevail.
f) Limit residential structures in the coastal high hazard area to two (2) stories.
g) Prohibit the expansion of R-2 occupancies in the coastal high hazard area.
h) Limit structures in the Old Homosas-sa Redevelopment Area to two (2) stories over the first living floor.
i) Require all structures constructed in the Old Homosassa Redevelopment Area to provide for a 10 foot step back of the second story over the first story.
j) Require all development in the Old Homosassa Redevelopment Area to further the character and vision provided for Old Homosassa and to be compatible with existing structures in the area.
k)Prohibit the development or expansion of general commercial uses within Old Homosassa.
The complaint then alleges that the proposed development is inconsistent with the Plan, because it:
a) Allows for the expansion of R-2 residential dwelling units in the coastal high hazard area.
b) Allows for the construction of three (3) story over parking residential structures in the coastal high hazard area.
c) Allows for the construction of structures that are not compatible with the character and vision of Old Homosas-sa.
d) Allows for the construction of four (4) residential structures which do not provide for a step back of stories.
e) Allows for increases in residential dwellings in the coastal high hazard area.
f) Allows for the expansion or development of new commercial uses within Old Homosassa.
g) Allows for the development of residential uses upon lands designated as GNC within Old Homosassa.
The trial court’s order indicates that it dismissed Plaintiffs’ Second Amended Complaint because it found that Plaintiffs had failed to sufficiently allege that their interests were adversely “affected by the project in a way not experienced by the general population.” Additionally, the trial court’s order adopted the “nexus” argument of Resort and the County, ruling that “there must be some nexus between the alleged evil of the challenged action and the adverse [e]ffect claimed.”

*336
Controlling Law

“A local comprehensive land use plan is a statutorily mandated legislative plan to control and direct the use and development of property within a county or municipality. The plan is likened to a constitution for all future development within the governmental boundary.” Machado v. Musgrove, 519 So.2d 629, 631-32 (Fla. 3d DCA 1987) (citations omitted). See also § 163.3167, Fla. Stat. (2007). Once a comprehensive plan has been adopted pursuant to the Local Government Comprehensive Planning and Land Development Regulation Act, “all development undertaken by, and all actions taken in regard to development orders by, governmental agencies in regard to land covered by such plan” must be consistent with that plan. § 163.3194(l)(a), Fla. Stat. (2007); see also § 163.3164(7), Fla. Stat. (2007).
Prior to 1985, common law governed a third party’s standing to intervene to challenge a development order as inconsistent with the governing comprehensive plan. See Parker v. Leon County, 627 So.2d 476, 479 (Fla.1993), Citizens Growth Mgmt. Coal., Inc. v. City of W. Palm Beach, 450 So.2d 204, 206-08 (Fla.1984). The common law rule provided that, in order to have standing to challenge a land use decision, a party had to possess a legally recognized right that would be adversely affected by the decision or suffer special damages different in kind from that suffered by the community as a whole. Putnam County Envtl. Council Inc. v. Bd. of County Comm’rs, 757 So.2d 590, 592-93 (Fla. 5th DCA 2000); Citizens Growth Mgmt. Coal., Inc., 450 So.2d at 206. In 1985, the Florida Legislature reacted to the Supreme Court’s 1984 decision in Citizens Growth Management that the common law rules of standing applied to the Growth Management Act by enacting section 163.3215, Florida Statutes.[6] Its stated purpose was “to ensure the standing for any person who ‘will suffer an adverse effect to an interest protected ... by the ... comprehensive plan.’ ” Parker, 627 So.2d at 479 (citing § 163.3215(2), Fla. Stat. (1985)); see also Edu. Dev. Ctr., Inc. v. Palm Beach County, 751 So.2d 621, 623 (Fla. 4th DCA 1999) (section 163.3215 is a remedial statute in that it “enlarged the class of persons with standing to challenge a development order as inconsistent with the comprehensive plan”). As a remedial statute, section 163.3215 is to “be liberally construed to advance the intended remedy....” Edu. Dev. Ctr., Inc., 751 So.2d at 623; see also Dunlap v. Orange County, 971 So.2d 171, 174 (Fla. 5th DCA 2007). There is no doubt that the purpose of the adoption of section 163.3215 was to liberalize standing in this context. See City of Ft. Myers v. Splitt, 988 So.2d 28 (Fla. 2d DCA 2008).
In part, section 163.3215(3), Florida Statutes (2007), provides:
Any aggrieved or adversely affected party may maintain a de novo action for declaratory, injunctive, or other relief against any local government to challenge any decision of such local government granting or denying an application for, or to prevent such local government from taking any action on, a development order, as defined in s. 163.3164, which materially alters the use or density or intensity of use on a particular piece of property which is not consistent with the comprehensive plan adopted under this part.
*337 Further, section 163.3215(2), Florida Statutes (2007), provides:
As used in this section, the term “aggrieved or adversely affected party” means any person[7] or local government that will suffer an adverse effect to an interest protected or farthered by the local government comprehensive plan, including interests related to health and safety, police and fire protection service systems, densities or intensities of development, transportation facilities, health care facilities, equipment or services, and environmental or natural resources. The alleged adverse interest may be shared in common with other members of the community at large but must exceed in degree the general interest in community good shared by all persons. The term includes the owner, developer, or applicant for a development order.
(Emphasis added). Thus, a person’s standing to bring a challenge under section 163.3215(3) depends on (1) whether the interests the person alleges are “protected or furthered by the local government comprehensive plan”; if so, (2) whether those interests “exceed in degree the general interest in community good shared by all persons”; and (3) whether the interests will be adversely affected by the challenged decision. See § 163.3215(2), Fla. Stat. (2007); see also Fla. Rock Props. v. Keyser, 709 So.2d 175, 177 (Fla. 5th DCA 1998).
There is nothing obscure about the statutory language requiring a person seeking standing to allege an interest that “[exceeds] in degree the general interest in community good shared by all persons” to establish standing. It simply means that a party must allege that they have an interest that is something more than “a general interest in community well being.” See Keyser, 709 So.2d at 177[8]; see also Stranahan House, Inc. v. City of Fort Lauderdale, 967 So.2d 427, 434 (Fla. 4th DCA 2007).[9] The statute does not say that a party must be harmed to a greater degree than the general public. Not surprisingly, the case law assumes that an organization has an interest that is greater than “the general interest in community well being” when the organization’s primary purpose includes protecting the particular interest that they allege will be adversely affected by the comprehensive plan violation. See Stranahan House, Inc., 967 So.2d at 434. The old common law test was so narrowly drawn that there often was no means of redress for a comprehensive plan violation. The expanded statutory test eliminates *338 “gadfly” litigation, yet gives oversight to the segment of the public that is most likely to be knowledgeable about the interest at stake and committed to its protection. The statute expressly identifies by multiple examples the kinds of interests the legislature intended to protect:
As used in this section, the term “aggrieved or adversely affected party” means any person or local government that will suffer an adverse effect to an interest protected or furthered by the local government comprehensive plan, including interests related to health and safety, police and fire protection service systems, densities or intensities of development, transportation facilities, health care facilities, equipment or services, and environmental or natural resources.
§ 163.3215(2), Fla. Stat. (2007) (emphasis added).
Application of the statutory test is illustrated by comparing two of the leading cases previously decided by this court. In Keyser, Timothy Keyser had filed a lawsuit challenging the decision of the Putnam County Commission to rezone a 509 acre parcel of Florida Rock Properties’ land from agricultural to mining. This Court held that Keyser’s allegation that the Commission’s decision “would adversely affect his quality of life by its negative impact upon wildlife populations and habitats in Putnam County” was insufficient to establish standing. 709 So.2d at 177. In explaining why the allegation was insufficient, this Court said, “Keyser never demonstrated any specific injury, only that the county would not be as bucolic as it once was. Keyser is a citizen with an interest in the environment and nothing more.” Id.
In Putnam County Environmental Council, Inc., a company owned a piece of land adjacent to the Etoniah Creek State Forest, which was zoned for agricultural use. The company and the local school board “applied for a special exception to the county’s comprehensive plan to allow the construction of a regional middle school complex on” the company’s property. 757 So.2d at 591. The application was approved, and the Putnam County Environmental Council [“PCEC”] subsequently filed a complaint, seeking to enforce Putnam County’s comprehensive plan pursuant to chapter 163. The trial court concluded that PCEC lacked standing to challenge the order under section 163.3215 and dismissed the action on that basis.
It its complaint, PCEC alleged that its “primary organizational purposes and activities include the study and protection of natural resources and the advocacy of sound land use and growth management policies affecting the environment”; that its officers and members had “initiated and facilitated the original public acquisition of the Etoniah Creek State Forest”; and that “[a] substantial number of [its] members, along with non-members who participate in PCEC-sponsored activities, use the Eto-niah Creek State Forest for recreational and educational purposes.” Putnam County Envtl. Council, Inc., 757 So.2d at 592. Additionally, PCEC alleged:
The use allowed under the special exception will adversely affect PCEC’s use and its members’ use of the adjacent Etoniah Creek State Forest as natural resource area. The use of the subject parcel for a school will adversely impact the ability of the Division of Forestry to use controlled burns to manage the adjacent state forest. Without controlled burns, habitat for a variety of species in the Etoniah Creek State Forest will be reduced or eliminated, thus adversely affecting the ability of PCEC, its members, and others who participate in *339 PCEC-sponsored activities to observe or study those species. Also, without controlled burns, much of the forest will become overgrown with understory species, thus adversely affecting the ability of PCEC, its members, and others who participate in PCEC-sponsored activities to access and hike portions of Etoniah Creek State Forest. Furthermore, the physical presence of a school plant as well as the increased traffic and the activity, lights, and noise associated with a school facility, athletic fields, parking lots, and school bands are incompatible with Etoniah Creek State Forest’s nature-based recreation and will discourage and interfere with the ability of wide-ranging species such as the black bear to reach or remain in the state forest. This will adversely affect the ability of PCEC, its members, and others who participate in PCEC-sponsored activities to observe or study those species ....

Id.

In holding that PCEC had made sufficient allegations to establish standing, this Court said:
[H]ere PCEC’s complaint alleged specific injuries that PCEC would suffer if a middle school complex was constructed on Roberts’ property, including the destruction of the habitat of species being studied by PCEC members and the elimination of PCEC members’ access to the forest and the forest’s creatures by the overgrowth of the forest. The diminution of species being studied by the group is a harm particular to PCEC, making PCEC more than just a group with amorphous “environmental concerns.” Accordingly, the allegations set forth in PCEC’s complaint are sufficient to demonstrate the requisite level of interest.
PCEC’s involvement in the original acquisition of the land for use as a state forest and its continued, active connection with that state forest further demonstrate an interest greater than that which all persons share in the community good.
Id. at 593-94.
On appeal, Plaintiffs begin with the premise that the trial court’s dismissal order was based on the trial court’s view that in order to have standing to mount a section 163.3215 challenge, the plaintiff must own real property adjacent to or very near the parcel at issue. It is true that there is much in the appealed order to suggest that was the court’s view. We do not believe the court’s analysis to be quite so narrow, however. It does appear that the trial court had difficulty envisioning how the “greater-in-degree” part of the statutory test for standing could be met if the plaintiff did not own adjacent real property. The “greater-in-degree” part of the test self-evidently would be met if the plaintiff is an adjacent property owner. Everyone else has to figure out how to surmount the tag-line test in Key ser,[10] i.e., how to be “something more” than just a “citizen with an interest in the environment.”
The County contends that Plaintiffs’ complaint lacks “facts sufficient to establish that the impact upon their educational efforts, enjoyment of the outdoors and use of government services is to a greater degree than others with the community,” and that Plaintiffs have failed to establish precisely how the alleged comprehensive plan violations, which relate to increased height and density, would impact their in *340 terests (i.e. their educational efforts, enjoyment of the outdoors and use of government services) to any greater degree than the Old Homosassa community as a whole. In its separate Answer Brief, Resort similarly asserts that Plaintiffs failed to specifically identify an “adverse interest or impact that” they “could expect to occur due to [its] proposed hotel expansion” and failed to show that their “interests are adversely affected in a way not experienced by the general population.”
Plaintiffs contend that the trial court’s dismissal should be reversed because they have alleged concrete and specific adverse interests that exceed in degree the general interest in community good shared by all. Plaintiffs maintain that it is not necessary for them to show that they will suffer a unique harm and reject the appellees’ position as being outside the express language and intent of the statute. We agree with Plaintiffs that the statutory test is directed to the quality of the interest of the person seeking standing; there is no requirement of a unique harm relative to the general population.
The allegations of the Second Amended Complaint amply demonstrate that each of the plaintiffs has an interest that is greater than “a general interest in community good shared by all persons.” The allegations show that the Plaintiffs all have a direct and demonstrated concern for the protection of the interests furthered by the comprehensive plan that would be adversely affected by allowing a development that violates the plan. An interpretation of the statute that requires harm different in degree from other citizens would eviscerate the statute and ignore its remedial purpose. It drags the statute back to the common law test. The statute is designed to remedy the governmental entity’s failure to comply with the established comprehensive plan, and, to that end, it creates a category of persons able to prosecute the claim. The statute is not designed to redress damage to particular plaintiffs. To engraft such a “unique harm” limitation onto the statute would make it impossible in most cases to establish standing and would leave counties free to ignore the plan because each violation of the plan in isolation usually does not uniquely harm the individual plaintiff. Rather, the statute simply requires a citizen/plaintiff to have a particularized interest of the kind contemplated by the statute, not a legally protectable right.
In sum, we conclude that the Second Amended Complaint adequately alleges Plaintiffs’ standing to challenge the County’s alleged failure to comply with its comprehensive plan in approving Resort’s project.[11] We accordingly reverse and remand for further proceedings.
REVERSED and REMANDED.
SAWAYA, J., concurs.
PLEUS, J., dissents, with opinion.

. Resort’s site is designated on the County’s generalized future land use map, (“GFLUM”), as CL, Low Intensity Coastal Lakes, which allows a maximum density of one (1) unit per 20 acres, is located in Flood Plain A-ll, and is located in the Coastal High Hazard Zone.

. Specifically, the County and Resort assert in their motion:
There exists no allegations within the complaint that establish how the height of the building or the net increase in units will adversely impact the Alliance' [sic] educational purpose or interest in the manatee, Bitter’s ability to fish in the river, Rendu-eles’ ability to bicycle through Old Homo-sassa, or Watkins’ ability to walk down the streets in Old Homosassa.

. The canal that Rendueles' property is on is part of the Homosassa River system and opens to the River at Resort’s site.

. Plaintiffs assert that the water system that the individual plaintiffs would share with Resort had "expressed concerns regarding the volume of water it will be able to supply because of [Resort's] project demands.”

. The Old Homosassa Redevelopment Area Plan is incorporated into the County’s Land Development Code as section 4680.

. The action underlying this appeal was brought pursuant to section 163.3215(3), Florida Statutes.

. Section 163.3164(17), Florida Statutes (2007), provides that, as used in the Local Government Comprehensive Planning and Land Development Regulation Act, ”[p]erson means an individual, corporation, governmental agency, business trust, estate, trust, partnership, association, two or more persons having a joint or common interest, or any other legal entity.”

. In Florida Rock Properties, 709 So.2d at 177, this Court wrote:
"[Kjeyser's standing to challenge the Board’s zoning decision depends on (1) whether the personal and professional interests he alleged are 'protected or furthered by’ Putnam County’s comprehensive plan; if so, (2) whether those interests are greater than the general interest in community well being; and (3) whether the interests are or will be adversely affected by the challenged zoning decision.”
(Emphasis added).

.In Stranahan House, Inc., 967 So.2d at 434, the Fourth District wrote:
Stranahan and Friends meet the test for standing outlined in Florida Rock Properties v. Keyser, 709 So.2d 175, 177 (Fla. 5th DCA 1998). The interests alleged are protected by the City's comprehensive plan, they are greater than the general interest in community well-being, and the interests will be adversely affected by the development.
(Emphasis added).

. "Keyser is a citizen with an interest in the environment and nothing more.” 709 So.2d at 177.

. As for the trial court’s denial of Plaintiffs’ request to further amend the complaint in light of the dismissal, Plaintiffs had not abused the privilege to amend. Accordingly, the trial court also erred in dismissing Plaintiffs’ complaint "with prejudice.”