41 So.3d 270 (2010)
NASSAU COUNTY, Appellant,
v.
Lynwood G. WILLIS and Jane T. Willis, husband and wife, Robert H. Still, Jr. and Michael D. Abney, as Co-Trustees of the Lynwood G. Willis and Jane T. Willis Trust u/d/o December 31, 1992, Vincent G. Graham, Piedmont Square, LLC, a Virginia Limited Liability Corporation, Amelia Island Company and Crane Island Investments LLC, a South Carolina Limited Liability Corporation, Intervenors-Appellants,
v.
Eric Titcomb, Robert Weintraub, and Julie Ferreira, Appellees.
No. 1D09-1008.
District Court of Appeal of Florida, First District.
June 3, 2010.
Rehearing Denied August 3, 2010.
*271 David A. Hallman and Mollie M. Garrett, Yulee, for Appellant.
Fred D. Franklin, Jr., and Cristine M. Russell of Rogers, Towers, P.A., Jacksonville, for Intervenors-Appellants.
Ralf Brookes, Cape Coral, for Appellees.
THOMAS, J.
In this case, we must decide two issues. First, must a person challenging a development order based on an alleged conflict *272 with a county's comprehensive plan show more than demonstrated recreational interests in the natural resources of the affected area in order to establish standing, pursuant to section 163.3215, Florida Statutes? We answer this question in the negative, and hold that such interests are sufficient under the plain text of the statute, especially in light of liberalizing amendments to the standing requirements. See City of Ft. Myers v. Splitt, 988 So.2d 28, 31-32 (Fla. 2d DCA 2008).
Second, we must decide whether a county's comprehensive plan policy that permits density adjustments based on an official jurisdictional wetlands determination is ambiguous or unlawful under chapter 163, Florida Statutes. We hold it is not ambiguous or unlawful. We therefore reverse the trial court's order setting aside the development order.

I. Facts and Procedural History

A. Nassau County's Comprehensive Plan
This action concerns the development of a privately-owned 207-acre site known as Crane Island located in Nassau County, Florida. In June 1993, Nassau County and The Department of Community Affairs (the Department) entered into a stipulated settlement agreement approving and amending Nassau County's Comprehensive Plan (the Comprehensive Plan). The Comprehensive Plan contains a future land use element which sets forth several polices, goals, and objectives concerning the treatment and development of wetlands in Nassau County.
A critical part of the Comprehensive Plan is the Future Land Use Map in which each parcel of property is given a land use designation. That designation determines the density at which the property may be developed. The Comprehensive Plan, as amended per the settlement agreement, provides:[1]
Conservation lands placed under the Limited Development Overlay may not be developed at a density greater than 1 residential dwelling unit per five acres with all permitted development clustered on the upland portion of the site or on that portion of the site which will be least environmentally impacted by construction/development. Where unless underlying land use as shown on the Future Land Use Map designates a lesser density, in which case the density of the underlying land use shall prevail. Passive recreation and silviculture, also, are permitted uses in the Limited Development Overlay area.
If there is indication that wetland is present on a proposed development site, the developer shall be required to request a wetland determination from the St. Johns River Water Management District.
Areas of Nassau County designated as "Conservation" land use to be included under a Limited Development Overlay, include all areas shown as wetlands on the Future Land Use Map series except for Fort Clinch State Park and Aquatic Preserve, Nassau River-St. Johns River Marshes Aquatic Preserve and Cary State Forest. Historic properties may also be included in the category of Limited Development.
With regard to protection of natural resources, changes made pursuant to the settlement agreement were as follows:
1.04A.02 The County shall restrict development in conservation areas to the *273 maximum extent possible short of a "taking". Development in conservation (Limited Development) will be permitted that must be permitted will proceed at a density of no greater than 1 unit per 5 acres with permitted density clustered on the upland portion of the parcel or on that part of the parcel that will least environmentally be affected by construction/development. Where the Future Land Use Map identifies an unless underlying land use requires of less density, In such cases, density of conservation areas will satisfy underlying land use density the density of the underlying land use will prevail. Development will be prohibited in areas designated as ConservationPreservation. (Policy 1.02.05.H, I.4).
. . . .
1.09.03 Areas identified on the FLUM map series as wetlands are generally defined. A landowner may provide more detailed data to the County to clarify jurisdictional wetland areas. Those land areas determined by the Board of County Commissioners with the advice of the St. Johns River Water Management District that are determined not to be jurisdictional wetlands will be allowed to be developed at the least intense adjacent land use densities and intensities, as determined by the County.
Testimony during the hearing indicated Crane Island was originally designated as both conservation and wetlands; however, the Future Land Use Map designated Crane Island entirely as wetlands. Wetlands must comply with the conservation land use designation under the Comprehensive Plan. In 1994, 1997, 2003, and 2005, various amendments to the Comprehensive Plan were proposed to reclassify Crane Island as non-conservation land in order to increase the density, but those amendments were withdrawn after the Department expressed opposition.

B. Development Proposal
In 2006, the owners and prospective developers (the Intervenors) of Crane Island submitted a proposal to change Crane Island's land use designation from wetlands to Planned Unit Development. The proposal included 169 residential units, up to 50 townhomes, 90 boat slips, boat basin, "lock" system, and marina. The island is currently inaccessible, but development of a 5.75-acre park included in the plan will make the island open to the public for the first time.
As part of the application process and pursuant to Policy 1.09.03 quoted above, the Intervenors submitted a formal wetlands determination issued by the St. Johns River Water Management District. This process required an application for a formal determination and wetlands delineation. The Water Management District determined that 71.58 acres of the Crane Island site were actually uplands, not wetlands.
Upon submission of the Planned Unit Development application in 2006, county planning staff evaluated its consistency with the Comprehensive Plan. The county planning director concluded that Policy 1.09.03 allowed development of the uplands portion of Crane Island. As part of his review, the planning director partially relied on an opinion letter by the Nassau County Attorney which concluded that Policy 1.09.03 applied to Crane Island, did not include any qualifying language, and, if density was utilized, did not require an amendment to the county's Future Land Use Map.
After a public hearing, Nassau County's Planning and Zoning Board recommended approving Policy 1.09.03 and allowing development of the uplands portion of Crane *274 Island. The County categorized the uplands area as low-density residential, which permits two units per acre, rather than one unit per five acres in jurisdictional wetlands. Following an additional public hearing, the Board of County Commissioners issued Ordinance 2006-08 approving the densities requested in the Planned Unit Development application.

C. Consistency Challenge and Trial Proceedings
Plaintiffs reside in Nassau County and oppose the development. They filed an amended complaint pursuant to section 163.3215, Florida Statutes, challenging the development's consistency with the Comprehensive Plan. In their second amended complaint, they alleged that the Comprehensive Plan authorized only 41 units, and that Policy 1.09.03 could not be applied to permit development at the higher density.
The case proceeded to non-jury trial and was bifurcated into two phases, consistency and standing. In order to establish standing, Plaintiffs claimed to be "aggrieved or adversely affected" parties, as required by section 163.3215, asserting that (1) they are environmentalists and members of an environmental organization; and (2) they enjoy recreational activities in the surrounding environment of Crane Island which will be negatively impacted by the proposed development.
In their complaints and discovery documents, Plaintiffs argued they generally utilize the waters surrounding Crane Island by participating in land, canoe, and kayak tours for the purpose of observing habitat, ecological systems, fish, and wildlife. According to Plaintiffs, the development will cause increased runoff due to lawn fertilizers, pesticides, and boat marina contaminants, and increased density on roads used for hurricane evacuation. One plaintiff, a resident of a community directly opposite Crane Island across the Amelia River, asserted the proposed marina and docks will create a large amount of river traffic which will adversely affect his enjoyment of the lands and waters.
During the trial, the court heard testimony from Plaintiffs, none of whom were tendered as experts in environmental impacts. Although residents of Nassau County, none had any legal, business, or financial interest in Crane Island or any adjacent property. They acknowledged the site is private property, but they have used it for their own purposes without the owners' permission. None have a view of Crane Island from their own property.
Plaintiffs testified solely as to their various occasional recreational activities and purported environmental concerns. Mr. Weintraub acknowledged he has never had the owners' permission to visit Crane Island, but he has utilized Crane Island for fishing and photographing scenic beauty and wildlife, especially birds. He admitted the type of fish around Crane Island may be found anywhere in the saltwaters of Northeast Florida. He stated that if the development is approved, his "ability to use this island for all recreational [purposes] would be gone."
Ms. Ferreira testified she used the immediate vicinity of Crane Island for recreational purposes. She attested the development will transform Crane Island into an area that can no longer be used as a "classroom for a natural area," and that it will impact her Sierra Club outings on the island. Like Mr. Weintraub, Ms. Ferreira agreed the fish around Crane Island may be found in other estuaries in Northeast Florida. She testified that her concerns with regard to the island's development are environmental and recreational.
In response, Nassau County and the Intervenors presented expert testimony by *275 an environmental scientist and wetlands delineator. The expert testified the development will not adversely impact any rare, unique, or endangered wildlife or habitat. He further stated there is nothing rare or unique about the wetlands or hardwood tree communities on the island, because similar environments are common throughout Northeast Florida, and no threatened or endangered wildlife or bird species live on Crane Island.
During the consistency phase, Plaintiffs offered, over objection, expert testimony from the Department's Director of the Office of Comprehensive Planning, the Department's General Counsel, and an urban planner. The crux of their argument was that Nassau County utilized Policy 1.09.03 to attempt to evade amending the Comprehensive Plan. The Department's employees opined that while Nassau County could use Policy 1.09.03 to make minor adjustments to wetlands delineations, it could not use the policy to make large-scale changes to the County's Future Land Use Map. According to the Department's testimony, the County's utilization of Policy 1.09.03 made the Comprehensive Plan "self-amending," which, in their view, is contrary to state law and leads to an absurd result.

D. Final Order
In its Final Order, the trial court quashed Ordinance 2006-08 in its entirety, held that Plaintiffs had standing to bring the claim, and found the Planned Unit Development was inconsistent with the Comprehensive Plan. The trial court noted, "Plaintiffs' testimony at trial was sufficient to show actual recreational use of the area in question . . . and that their interests will be adversely affected by the increased inconsistent density, which is an interest protected by the Comprehensive Plan."
The Final Order contained no finding that the Comprehensive Plan or Policy 1.09.03 was ambiguous. Without justifying the use of extrinsic evidence to interpret the Comprehensive Plan, the trial court discussed the Plaintiffs' expert witness testimony and found "the density approved by the development order [is] inconsistent with the maximum allowable density established by [the Comprehensive Plan]," because Policy 1.09.03 could not be used or applied to Crane Island in the manner proposed to change the land use designation of Crane Island.
The trial court determined the non-deferential standard of strict judicial scrutiny applies in zoning challenges on the ground that the proposed project is inconsistent with the Comprehensive Plan. The trial court determined that once a plan is adopted, all actions taken by the local government in regard to development orders must be consistent with the plan "unless a plan amendment is submitted and approved by" the Department. The trial court accepted testimony by the Department that the County's use of Policy 1.09.03 made the Comprehensive Plan "self-amending," which was prohibited. The trial court found the current Future Land Use Map shows Crane Island as wetlands, which corresponds to the "Conservation-Wetlands" land use designation, which limits development of the island to one unit per five acres; therefore, the maximum allowable density is approximately 41 units. Finally, the trial court agreed with the Department's conclusion that allowing Nassau County to utilize Policy 1.09.03 to make land use changes would lead to an absurd result, because "use of the Policy to make large-scale changes to the Future Land Use Map of whole cloth would violate state statutes and deprive the reviewing agencies an opportunity to object, comment and make recommendations *276 and the public participation in the Comprehensive Plan Amendment process."

II. Analysis

A. Standing
Citizen enforcement is the primary tool for holding local government to its land use "constitution"[2] by insuring the consistency of development orders with the city's or county's comprehensive plan. Adopting the County's position here would mean that no citizen in this case would have standing to seek enforcement of the Comprehensive Plan.
Under section 163.3215, "an aggrieved or adversely affected party" has standing to challenge the consistency of a development order with a comprehensive plan. An "aggrieved or adversely affected party" is defined as:
[A]ny person or local government that will suffer an adverse effect to an interest protected or furthered by the local government comprehensive plan, including interests related to health and safety, police and fire protection service systems, densities or intensities of development, transportation facilities, health care facilities, equipment or services, and environmental or natural resources. The alleged adverse interest may be shared in common with other members of the community at large but must exceed in degree the general interest in community good shared by all persons.
(Emphasis added.)
As Plaintiffs assert, the standard of review for statutory standing under section 163.3215 to challenge consistency with the Comprehensive Plan is set forth in Edgewater Beach Owners Association, Inc. v. Walton County:
Determining whether a party has standing is a pure question of law to be reviewed de novo. Prior to 1985, the common law rule for standing applied to actions challenging a land use decision. Under the common law rule, a party had to possess a legally recognized right that would be adversely affected by the land use decision in order to have standing to challenge that decision. The 1985 adoption of section 163.3215, however, liberalized the standing requirements by providing a right to enforce a comprehensive plan to parties having more than a general interest.
833 So.2d 215, 219-20 (Fla. 1st DCA 2002) (citations omitted), receded from on other grounds, Bay Point Club, Inc. v. Bay County, 890 So.2d 256 (Fla. 1st DCA 2004) (noting the statute "gives citizens with adversely affected interests a significantly enhanced standing to challenge the consistency of development decisions with the local comprehensive plan").
Section 163.3215 is a remedial statute which must be liberally construed in order to protect the public interests identified in the statute. See Parker v. Leon County, 627 So.2d 476, 479 (Fla.1993); Edgewater Beach, 833 So.2d at 220; S.W. Ranches Homeowners Ass'n, Inc. v. Broward County, 502 So.2d 931, 935 (Fla. 4th DCA 1987). This concept was recently explained by the Fifth District Court of Appeal:
The statute is designed to remedy the governmental entity's failure to comply with the established comprehensive plan. . . . The statute is not designed to redress damage to particular plaintiffs. To engraft . . . a `unique harm' limitation onto the statute would make it impossible *277 in most cases to establish standing and would leave counties free to ignore the plan because each violation of the plan in isolation usually does not uniquely harm the individual plaintiff. Rather, the statute simply requires a citizen/plaintiff to have a particularized interest of the kind contemplated by the statute. . . .
Save Homosassa River Alliance, Inc. v. Citrus County, 2 So.3d 329, 340 (Fla. 5th DCA 2008), review denied, 16 So.3d 132 (Fla.2009). Prior to the enactment of section 163.3215, limitations on standing resulted in "a failure to conform development decisions to the plan based upon the fact that citizens lacked standing to challenge development orders for lack of consistency with the comprehensive plan." James C. Nicholas & Ruth L. Steiner, Growth Management and Smart Growth in Florida, 35 Wake Forest L.Rev. 645, 657 (2000) (quoting Daniel W. O'Connell, Growth Management in Florida: Will State and Local Governments Get Their Acts Together?, Florida Envt'l & Urban Issues, 1-5 (June 1984)).
The Legislature used the phrase "exceeds in degree" when defining the required "adverse interest" to establish standing as a distinction between the public's "general interest in community good shared by all persons." The phrase "in degree" is significant, because degree is defined as "the extent, measure, or scope of an action, condition, or relation ." Merriam-Webster Online Dictionary, http:// www.merriam-webster.com/dictionary/ degree [1] (last accessed April 1, 2010). In comparison, "kind" is defined as "fundamental nature or quality: essence." Merriam-Webster Online Dictionary, http:// www.merriam-webster.com/dictionary/kind [1] (last accessed April 1, 2010). Thus, section 163.3215 does not require an adverse interest different in kind, such as an adverse effect on property ownership or commercial interest, from that of the public's interest in the community. Rather, section 163.3215 requires only that the adverse interest exceed in degree that of the public's "interest in the community good shared by all persons." By its use of the measure "in degree," the Legislature demonstrated that only the intensity of the activity or interest must exceed that of the general public, rather than the fundamental nature or quality.
For example, in Save Homosassa River Alliance, Inc., the plaintiffs met the statutory standing requirement by alleging that they owned property within Homosassa or within three miles of the proposed development site, were conscious of governmental actions that affected the health of the Homosassa River, participated in public conversations regarding development, frequently fished or boated on the river, visited its shores to admire the river and wildlife, and walked or bicycled along the streets in Old Homosassa. 2 So.3d at 332-33. The plaintiffs also alleged that they received potable water from the Homosassa Special Water District, fire protection from the County's fire department, police protection from the County's Sheriff's Department, and emergency services by Nature Coast EMS. Id. The Fifth District concluded that the plaintiff's allegations amply demonstrated each had an interest greater than the general interest in community good shared by all persons. Id. at 340.
Likewise, Plaintiffs here have demonstrated standing through their amended complaint, affidavits, and testimony. The trial court determined, on ample evidence, that Plaintiffs "maintain an active and continuing connection to the affected land, or are members of an organization whose primary purpose is the study and protection *278 of natural resources and the advocacy of sound land use and growth management policies affecting the environment, who use the land and as such have standing to bring this lawsuit." Through their land, canoe, and kayak tours of the area surrounding Crane Island for fishing, boating, observing, and photographing habitat and wildlife, the plaintiffs have demonstrated a connection with Crane Island that "exceed[s] in degree" the general public's interest in the "community good" in Nassau County.
Section 163.3215 establishes a broad legislative grant of standing which we are not at liberty to reject. The statute contains no requirement that a person own adjacent property, maintain a special business interest, or have some other quantifiable property status to challenge a land use decision as being inconsistent with a comprehensive plan. Accordingly, the portion of the trial court's order finding that Plaintiffs demonstrated standing is affirmed.

B. Consistency
Plaintiffs vigorously argue that deference should not be given to a local government's interpretation of its comprehensive plan. See Dixon v. City of Jacksonville, 774 So.2d 763, 764-65 (Fla. 1st DCA 2000). Interpretation of the Comprehensive Plan is reviewed de novo. Id. at 765 (explaining "[i]t is well established that the construction of statutes, ordinances, contracts, or other written instruments is a question of law that is reviewable de novo, unless their meaning is ambiguous."); cf. B.B. McCormick & Sons, Inc. v. City of Jacksonville, 559 So.2d 252, 257 (Fla. 1st DCA 1990) (applying deferential standard, instead of strict scrutiny, where consistency with comprehensive plan was "heavily dependent upon interpretation of the terms of the plan").
Policy 1.09.03 of the Comprehensive Plan is direct, clear, and simple: "Those land areas determined by the Board of County Commissioners with the advice of the St. Johns River Water Management District that are determined not to be jurisdictional wetlands will be allowed to be developed at the least intense adjacent land use densities and intensities." It is undisputed that the Water Management District designated the relevant property as uplands, not wetlands. Whether Policy 1.09.03 is a wise provision, or whether the Department now thinks the policy gives Nassau County too much latitude, are issues not before us.
Neither Nassau County nor the Intervenors have any power to force the Water Management District to make a particular decision regarding the ecological status of the relevant property. It is not alleged that the County acted without the advice of the Water Management District; the County simply adopted the Water Management District's findings. The County's action is consistent with the Comprehensive Plan, because Policy 1.09.03 precisely provides that wetlands may be redefined after the County receives advice from the Water Management District.
Plaintiffs argued below, and the trial court found, that Nassau County's utilization of Policy 1.09.03 leads to an "absurd result" because its application significantly changes the land use designation of 71.58 acres from wetlands to uplands. Witnesses from the Department provided similar testimony. But the plain language of the Comprehensive Plan's provision provides for this expected result. It is legally irrelevant that Nassau County unsuccessfully attempted to amend the Comprehensive Plan under other provisions of state law to reach the same result, perhaps due to objections by the Department. While some of the Department's employees now *279 think the County's interpretation of Policy 1.09.03 is unlawful, the Department and Nassau County negotiated the approval of the Comprehensive Plan, which included Policy 1.09.03.
Courts should exercise great caution before deviating from the plain text of a constitution, statute, or legislative document to purportedly avoid reaching what a court considers an "absurd result." When inappropriately utilized, the absurdity doctrine allows courts to substitute their judgment of how legislation should read, rather than how it does read, in violation of the separation of powers enshrined in Article II, section 3 of the Florida Constitution. When the language of a statute is unambiguous, courts are bound to follow the text. See Conn. Nat'l Bank v. Germain, 503 U.S. 249, 253, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992) (referring to rule of statutory construction as the "one, cardinal canon before all others"); see also Webster et al., Statutory Construction In Florida: In Search of a Principled Approach, 9 Fla. Coastal L.Rev. 435, 505 n. 482 (2008).
Courts may only legitimately rely on the "absurdity doctrine" without running afoul of the separation of powers where "applying the plain language would be, in a genuine sense, absurd, i.e., where it is quite impossible that [the legislative body] could have intended the result . . . and where the alleged absurdity is so clear as to be obvious to most anyone." Public Citizen v. U.S. Dep't of Justice, 491 U.S. 440, 470-71, 109 S.Ct. 2558, 105 L.Ed.2d 377 (1989) (Kennedy, J., concurring) (citation omitted; emphasis added); see also Webster et al., supra at n. 485; Haddock v. Carmody, 1 So.3d 1133 (Fla. 1st DCA 2009) (declining to read statute literally in order to avoid an absurd result). Nassau County's application of Policy 1.09.03 could not in any reasonable way be considered "absurd," because the Water Management District did, in fact, reclassify the status of the affected property.
Plaintiffs acknowledge that a "local comprehensive land use plan is a statutorily mandated legislative plan to control and direct the use and development of property within a county or municipality. The plan is likened to a constitution for all future development with the governmental boundary." Machado v. Musgrove, 519 So.2d 629, 631 (Fla. 3d DCA 1987) (citations omitted). The Comprehensive Plan provides that the County can make wetlands designation changes based on the advice of a disinterested scientific decision of a governmental body charged with delineating jurisdictional wetlands. Nassau County did just that here.
The County's argument that Policy 1.09.03 is not a "self-amending" provision, but rather a self-executing provision that is triggered by independent findings by the Water Management District, is persuasive. Quite simply, if the Water Management District advises Nassau County that wetlands are not wetlands, the affected property can be developed at the least intense adjacent density. Thus, Policy 1.09.03 is self-executing, reasonable, and not invalid under any state law.

Conclusion
We AFFIRM the trial court's holding that Appellees established standing pursuant to section 163.3215, Florida Statutes, but disagree with the trial court's ruling on consistency. The trial court's order quashing Nassau County Ordinance 2006-08 is REVERSED and REMANDED with directions to reinstate the ordinance and Nassau County's action approving the Crane Island Planned Unit Development pursuant to Policy 1.09.03 of the Comprehensive Plan.
*280 AFFIRMED in part, REVERSED in part, and REMANDED.
HAWKES, C.J., concurs in part and dissents in part, with opinion; BENTON, J., concurs in part and dissents in part with opinion.
HAWKES, C.J., concurs in part, dissents in part, with opinion.
I concur in reversing the trial court and reinstating the Nassau County development order. I dissent, however, from the portion of the opinion concluding the Appellees had standing to challenge the development order in the first place.

§ 163.3215
Whether a party has standing to enforce a local comprehensive plan is a pure question of law subject to de novo review. See Bay Point Club, Inc. v. Bay County, 890 So.2d 256 (Fla. 1st DCA 2004).
Section 163.3215, Florida Statutes, (2006) provides:
163.3215 Standing to enforce local comprehensive plans through development orders.
(1) Any aggrieved or adversely affected party may maintain an action for injunctive or other relief against any local government to prevent such local government from taking any action on a development order, as defined in s. 163.3164, which materially alters the use or density or intensity of use on a particular piece of property that is not consistent with the comprehensive plan adopted under this part.
(2) "Aggrieved or adversely affected party" means any person or local government which will suffer an adverse effect to an interest protected or furthered by the local government comprehensive plan, including interests related to health and safety, police and fire protection service systems, densities or intensities of development, transportation facilities, health care facilities, equipment or services, or environmental or natural resources. The alleged adverse interest may be shared in common with other members of the community at large, but shall exceed in degree the general interest in community good shared by all persons.

(Emphasis added).
Pursuant to section 163.3215, a party's standing to enforce a comprehensive plan depends on it being "aggrieved or adversely affected." A party is "aggrieved or adversely affected" if: (1) the comprehensive plan protects or furthers the party's personal and professional interests; (2) such interests are, or will be, adversely affected by the challenged zoning decision; and (3) such interests are greater than the general interest the community has in its well being. See Fla, Rock Props. v. Keyser, 709 So.2d 175, 176-77 (Fla. 5th DCA 1998).

Analysis
The Appellees have failed to demonstrate an interest in Crane Island that exceeds the general interests of the citizens of Nassau County. They have also failed to demonstrate how implementation of the proposed development order would adversely affect their alleged interests.
The Appellees' interests are far less substantial than the interests of parties that are generally considered to have standing to enforce a comprehensive plan. For example:
In Keyser, the Fifth District held that a party must demonstrate a specific injury to have standing pursuant to section 163.3215. 709 So.2d at 176-77. In reaching this holding, the court concluded a general interest in the environment equivalent to a claim that the county would be less "bucolic" if development occurs is insufficient *281 to establish standing. Id. In Edgewater, this Court held that a party has standing to challenge a development order only if they will suffer an "actual adverse effect" as a result of proposed development. 833 So.2d 215 (Fla. 1st DCA 2002), receded from on other grounds by Bay Point Club, Inc. v. Bay County, 890 So.2d 256 (Fla. 1st DCA 2004). Accordingly, the Court found a party that owns or has a legal interest in land adjacent to property subject to a development order has standing to challenge the order. Id.; See also Stranahan House, Inc. v. City of Fort Lauderdale, 967 So.2d 427, (Fla. 4th DCA 2007). In Payne v. City of Miami, the Third District found that a local marine group, whose members owned and operated a marine industry business on the Miami River, had sufficient interests to attain standing under section 163.3215. 927 So.2d 904, 905 (Fla. 3d DCA 2005). Specifically, the court found the marine group, by demonstrating the impact that development would have on its business, proved an adverse interest that "exceed[ed] in degree the general interest in community good shared by all persons." Id. Finally, in Putnam County Envtl Council, Inc. v. Bd. of County Comm'r of Putnam County, the Fifth District found that an established environmental organization had standing to challenge a development order. 757 So.2d 590, 594 (Fla. 5th DCA 2000). In its holding, the court concluded the organization's interests had been adversely affected because it had previously aided the State in acquiring the land adjacent to the property to be developed. Id.

Appellee's Interest in Crane Island
The Appellees base their "aggrieved or adversely affected" status on grounds that they sporadically conduct various recreational activities in the waterways surrounding Crane Island, that their enjoyment of the island's scenic beauty will be impacted, that their ability to photograph wildlife surrounding Crane Island will be reduced, that the overall look of Crane Island's natural canopy will be diminished, and that the environment in Nassau County will suffer from the proposed development. Such interests are indistinguishable from those shared in general by the Nassau County community.
Moreover, Appellees have presented little evidence linking the Crane Island development to any alleged impact to their named interests. Although they reside in Nassau County, the Appellees concede that they do not have any legal interest in Crane Island or its surrounding properties, they acknowledge they do not have any business or financial interests related to Crane Island, they admit Crane Island is private property and that they used it and its surrounding areas for recreational purposes without the permission of the owners, and they recognize their allegations regarding the environmental effect that the proposed development of the island would have is mere speculation.[3]
Because (1) the Appellees' interests do not exceed that of the general public; and (2) the Appellees failed to prove any adverse effects to their asserted interests, I do not believe the Appellee's established themselves as "aggrieved and adversely affected" parties pursuant to section 163.3215. Accordingly, I would reverse *282 the trial court ruling and hold the Appellees not only failed to demonstrate that the development order was inconsistent with the Nassau County Comprehensive plan, but that they lacked standing to challenge the development order.
BENTON, J., concurring in part and dissenting in part.
I join the majority opinion insofar as it treats the standing question, and the judgment of the court to that extent, but I respectfully dissent from the judgment of the court insofar as it reverses the trial court's ruling that the development order is inconsistent with the comprehensive plan. I believe the trial court got it right, and would affirm the final order in its entirety.
The trial court ruled, not that Crane Island could not be developed, but that the density approved by the challenged development order would have allowed more than four times as many units as what the comprehensive plan set as a maximum. As the majority opinion concedes, conservation was the land use designation for the whole of Crane Island when the Department of Community Affairs originally approved a comprehensive plan for Nassau County, with a permitted density for Crane Island of one unit per five acres.[4] Crane Island's conservation land use designation has never changed.
This was not for want of trying. As the trial court found, and as the majority opinion notes, with commendable candor: "In 1994, 1997, 2003, and 2005, various amendments to the Comprehensive Plan were proposed to reclassify Crane Island as non-conservation land in order to increase the density, but those amendments were withdrawn after the Department expressed opposition." Ante, p. 273 This string of unsuccessfully proposed amendments[5] leaves no doubt that Nassau County is well aware that the conservation land use designation remains applicable to Crane Island and has proceeded from that premise all along.[6]
*283 The majority opinion represents a gross misapplication of a technical provision in the comprehensive plan, Policy 1.09.03, which permits refining the boundaries between wetlands and uplands based on surveys performed by the St. Johns River Water Management District, when the precise location of a boundary between uplands and jurisdictional wetlands depicted on the future land use map is in doubt. When such a boundary separates a wetland tract on which development is not allowed from an upland tract on which development is permissible, Policy 1.09.03 provides that land areas "that are determined not to be jurisdictional wetlands will be allowed to be developed at the least intense adjacent land use densities and intensities." The least intense adjacent land use in this case is conservation,[7] which permits a density of no more than one unit per five acres, as the trial court found.[8]
The majority opinion conflates the conservation land use designation with the mapping of jurisdictional wetlands. "Wetland" is not a designated land use category. See Nassau County Comprehensive Plan, Policy 1.02.05. Neither is "jurisdictional wetland," which simply denotes a wetland over which the St. Johns River Water Management District has permitting and enforcement jurisdiction. The Conservation Element of the Comprehensive Plan, Goal 6.0, provides for conserving and protecting the "natural resources of the area, including air, water, wetland, waterwells, estuaries, water bodies, soils, minerals, vegetative communities, wildlife, wildlife habitat, and other natural and environmental resources," not just jurisdictional wetlands.
The future land use map incorporated into the comprehensive plan as an integral part[9] places all of Crane Island within the *284 same land use category and depicts no boundary between uplands and wetlands. Elsewhere, the comprehensive plan provides that jurisdictional wetlands may be developed only "with all permitted development clustered on the upland portion of the site or on that portion of the site which will be least environmentally impacted." Nassau County Comprehensive Plan, Policy 1.02.05I. The effect of a survey delineating the boundary between jurisdictional wetlands and uplands on the parcel at issue hereall of which is designated conservationis to locate the portion of the parcel on which development is to be "clustered," not to quadruple the absolute number of units. Policy 1.09.03[10] does not affect the conservation land use designation, or alter density for the parcel as a whole.
Because the trial courthaving correctly reached the questioncorrectly determined that the density approved by the development order far exceeds the maximum allowable density established by the comprehensive plan, I would affirm the order on appeal.
NOTES
[1] Language added to the Comprehensive Plan is underlined, and deleted material is stricken through.
[2] "The comprehensive plan is similar to a constitution for all future development within the governmental boundary." Citrus County v. Halls River Dev., Inc., 8 So.3d 413, 420-21 (Fla. 5th DCA 2009).
[3] Appellees did not present any expert testimony regarding environmental impacts that would adversely affect their interests. The County and the Intervenors, however, presented the testimony of an environmental scientist and wetland delineator who testified that there would be no adverse impact to any rare, unique, or endangered habitat or wildlife as a result of the development.
[4] The Department determined this land use designation was appropriate not only because wetlands are present, but also because maritime forests are on the island. See Nassau County Comprehensive Plan, Objective 1.04A.02 ("The County shall restrict development in conservation areas to the maximum extent possible short of a `taking'. Development in conservation (Limited Development) will be permitted at a density no greater than 1 unit per 5 acres with permitted density clustered on the upland portion of the parcel. . . .").
[5] In order for a local government to amend its comprehensive plan, it must follow the procedure set out in section 163.3184(2), Florida Statutes. Florida Administrative Code Rule 9J-5.003(6) makes clear that "amendment" includes "any action of a local government which has the effect of amending, adding to, deleting from or changing an adopted comprehensive plan element or map or map series." As part of the 1993 settlement between Nassau County and the Department of Community Affairs in which the comprehensive plan was originally approved, Crane Island was designated conservation for land use purposes on the future land use map. The County did not propose any "wetlands" land use category (although the word wetlands appears on the future land use map legend) in 1993 or thereafter, and the future land use map depicting Crane Island has not been amended since 1993.
[6] The Department's Objections, Recommendations and Comments in response to these proposed amendments reflected the Department's wide-ranging concerns which were not solely or even predominantly based on the extent of wetlands on Crane Island. The Department of Community Affairs was concerned, for example, that the proposed amendments would increase permitted density and the intensity of uses in a designated coastal high hazard area, that there were insufficient data and analysis to demonstrate that the proposed land uses would protect identified natural resources on and off-site, and that the data were insufficient to demonstrate that the proposed amendment would be compatible with surrounding land uses, especially with adjacent conservation uses.
[7] The privately-owned portion of Crane Island that is the subject of the development order under challenge is a 207-acre parcel. The St. Johns River Water Management District determined that 71.58 acres of this privately-owned 207-acre parcel are uplands over which it has no jurisdiction. But this determination had no legal effect on the conservation land use designation of any part of the island. All of Crane Island in private ownership, as well as the northern end of Crane Island, which is owned by the Florida Inland Navigation District, is designated conservation.
[8] By limiting density to one unit per five acres, the comprehensive plan limits residential development on the 207-acre parcel to 41 units.
[9] Local governments are required to adopt comprehensive plans that conform to the requirements of Chapter 163. § 163.3167(2), Fla. Stat. (2009). A required element of a comprehensive plan is a "future land use plan element designating proposed future general distribution, location, and extent of the uses of land for residential uses, commercial uses, industry, agriculture, recreation, conservation, education, public buildings and grounds, other public facilities, and other categories of the public and private uses of land. . . . Each future land use category must be defined in terms of uses included, and must include standards to be followed in the control and distribution of population densities and building and structure intensities. The proposed distribution, location, and extent of the various categories of land use shall be shown on a land use map or map series which shall be supplemented by goals, policies, and measurable objectives." § 163.3177(6)(a), Fla. Stat. (2009).

The comprehensive plan must also include "[a] conservation element for the conservation, use, and protection of natural resources in the area, including air, water, water recharge areas, wetlands, waterwells, estuarine marshes, soils, beaches, shores, flood plains, rivers, bays, lakes, harbors, forests, fisheries and wildlife, marine habitat, minerals, and other natural and environmental resources. . . ." § 163.3177(6)(d), Fla. Stat. (2009). Additionally, "[t]he land use map or map series contained in the future land use element shall generally identify and depict the following: 1. Existing and planned waterwells and cones of influence where applicable. 2. Beaches and shores, including estuarine systems. 3. Rivers, bays, lakes, flood plains, and harbors. 4. Wetlands. 5. Minerals and soils. 6. Energy conservation. The land uses identified on such maps shall be consistent with applicable state law and rules." Id.
[10] Set out under Objective 1.09, Policy 1.09.03 reads in its entirety:

Areas identified on the FLUM as wetlands are generally defined. A landowner may provide more detailed data to the County to clarify [the precise location of] jurisdictional wetland areas. Those land areas determined by the Board of County Commissioners with the advice of the St. Johns River Water Management District that are determined not to be jurisdictional wetlands will be allowed to be developed at the least intense adjacent land use densities and intensities. Where the adjacent land use remains wetlands the county will allow the use to be the least intense use bordering on the surrounding wetland.