# FIRST DISTRICT COURT OF APPEAL
## STATE OF FLORIDA

———————————————

Nos. 1D19-0980
1D19-1530

———————————————

JUDAH IMHOF, RICHARD
BULLARD, BEACH TO BAY
CONNECTION, INC., and SOUTH
WALTON COMMUNITY COUNCIL,
INC.,

    Appellants,

    v.

WALTON COUNTY, FLORIDA, a
political subdivision of the State
of Florida, and ASHWOOD
HOLDINGS FLORIDA, LLC, a
Florida limited liability
company,

    Appellees.

———————————————

On appeal from the Circuit Court for Walton County.
David W. Green, Judge.

September 15, 2021

TANENBAUM, J.

The primary question here concerns the scope of a trial court's de novo review in an action, brought pursuant to section 163.3215(3), Florida Statutes (2018), challenging whether a development order is consistent with a local comprehensive plan.

As we will explain in detail, we agree with the appellants, based on our reading of the statutory text, that the trial court should have considered *all* of their claims of inconsistency and not just those specifically addressed to plan components concerning land use, density, or intensity of use. We then must certify conflict with the Second District's holding in *Heine v. Lee County*, 221 So. 3d 1254 (Fla. 2d DCA 2017), that the provision *does* limit a party to those three bases for challenging a development order's consistency. Because the trial court, in reliance on *Heine*, failed to consider several of the appellants' inconsistency claims before rendering judgment against them, we reverse and remand for the trial court to consider and dispose of those claims on the merits.

There are two ancillary issues we also must address. First, we agree with South Walton Community Council, Inc. ("SWCC") that it has standing to participate in the appellants' consistency action as an "aggrieved or adversely affected party," as that term is defined in section 163.3215(2). Because the trial court reached the opposite conclusion, we instruct the trial court to reinstate SWCC for the remainder of the proceeding on remand. Second, the appellants ask that we reverse the separate amended cost judgment against them. Because costs were taxed in favor of Ashwood Holdings Florida, LLC ("Ashwood") when it was one of the prevailing parties under the final judgment, our reversal of that judgment requires that we reverse the cost judgment as well.

I.

These cases stem from a grant of a development order by Walton County to Ashwood. The order allowed Ashwood to build a new planned unit development ("PUD") known as Cypress Lake. Cypress Lake was to consist of one hundred forty-one residential units, which would be divided into eighty-five single-family houses, forty duplex units, and sixteen condominium units. The PUD also would include fifty-three thousand square feet of commercial space divided among four mixed-use buildings. The land to be developed abuts Walton County Highway 30-A on one side, and Topsail Hill Preserve State Park, a conservation zone, on at least one other.

Before us are four appellants. Two are individual landowners. Two are non-profit corporations concerned with environmental

2

conservation and sustainable development within Walton County. All of them sued the county and Ashwood pursuant to section 163.3215(3). In the suit, they asserted that the development order approving the Cypress Lake PUD materially altered the designated land use, density, and intensity of use for the parcel where the PUD would be located. They in turn claimed that the order was inconsistent with the county's comprehensive development plan in a variety of ways. They sought to invalidate the development order and stop Cypress Lake from being constructed as proposed.

The appellants divided the alleged inconsistencies across three broad headings and identified those inconsistencies in terms of objectives and policies within the local plan. The trial court re-categorized the claims as follows:

1) density and intensity of development in excess of that allowed by the [comprehensive plan];[1]

2) violation of the setback requirements for construction within the Highway 30-A Scenic Corridor;

3) violation of the buffer requirements between the project and an adjoining residential subdivision;

4) violation of the plan's buffer requirements between the project and Topsail Hill Preserve State Park; and

---

[1] "Density" refers to "an objective measurement of the number of people or residential units allowed per unit of land, such as residents or employees per acre." § 163.3164(12), Fla. Stat.

"Intensity" means "an objective measurement of the extent to which land may be developed or used, including the consumption or use of the space above, on, or below ground; the measurement of the use of or demand on natural resources; and the measurement of the use of or demand on facilities and services." *Id.* (22).

5) violation of the requirement that streets in the proposed development have sidewalks along both sides.

The county and Ashwood asserted that none but the first of these claims is cognizable under the statute. By their reading, section 163.3215(3) limits the type of inconsistency claims that can be brought. They argued that the only cognizable (or "relevant") claims in an action under the subsection are those addressing inconsistency with the aspects of the comprehensive plan dealing with land use, density, and intensity of use. They also argued that the appellants were not "aggrieved or adversely affected" parties under section 163.3215(2), so the appellants did not have standing to sue in any event. Regardless of any of the claims asserted, though, the county and Ashwood maintained that the development order for the Cypress Lake PUD was entirely consistent with the comprehensive plan.

Relying on the Second District's decision in *Heine*, the trial court agreed with the county and Ashwood about the scope of claims that could be asserted in a suit under section 163.3215(3). As a result, the court held a multi-day evidentiary hearing but engaged in a de novo review of the county's grant of the Cypress Lake development order *only* with respect to the inconsistency claims relating to density and intensity (*i.e.*, the first category described by the trial court). The court found that the proposed Cypress Lake PUD, in this respect at least, was consistent with the county's comprehensive plan. The court also concluded that SWCC could not sue under section 163.3215(2), finding that it lacked an interest in the development beyond that shared by all persons. The court rendered a final judgment against the appellants based on these determinations, and it rendered a separate cost judgment in favor of Ashwood as a prevailing party.

Two appeals, now consolidated, followed. One challenges the final judgment determining that the development order approving the Cypress Lake PUD is consistent with the comprehensive plan (Case Number 19-980). The other challenges the ensuing cost judgment (Case Number 19-1530). In the former case, no one challenges the trial court's determination regarding the one category of claim (regarding density and intensity) it left intact. We do not address it here. Instead, we consider the appellants'

assertion that the trial court erred by refusing to include all of their claims as part of its de novo review, and that it erred by dropping SWCC as a plaintiff.[2]

## II.

## A.

Let us first put section 163.3215(3) in context. Under Florida's Community Planning Act,[3] county and municipal governments must develop comprehensive plans, approved by the State, that outline their respective "principles, guidelines, standards, and strategies" for land development in the future. § 163.3177(1), Fla. Stat. (2018); *see also id.* (1)(c) (providing that the format of a comprehensive plan "typically is expressed in goals, objectives, policies, and strategies"). The purpose of comprehensive planning is not to compel local governments to regulate their land in a particular way, but rather to "establish meaningful and predictable standards for the use and development of land and provide meaningful guidelines for the content of more detailed land development and use regulations." *Id.* (1).

The Act requires that there be several "elements" in the comprehensive plan, which generally include the following:

- Capital improvements. *Id.* (3)(a).

- Future land use plan. *Id.* (6)(a).

- Transportation. *Id.* (6)(b).

- A "general sanitary sewer, solid waste, drainage, potable water, and natural groundwater aquifer recharge element." *Id.* (6)(c).

---

[2] As we hinted at in the introduction, our disposition on the merits in Case Number 19-980 will dictate our disposition of the appeal of the cost judgment in Case Number 19-1530.

[3] *See* § 163.3161(1), Fla. Stat. (2018) ("This part shall be known and may be cited as the 'Community Planning Act.'").

5

- Conservation. *Id.* (6)(d).

- Recreation and open space. *Id.* (6)(e).

- Housing. *Id.* (6)(f).

- Coastal management, for counties that abut the Gulf of Mexico or the Atlantic Ocean (like Walton County), and specified others. *Id.* (6)(g).

- Intergovernmental coordination. *Id.* (6)(h).[4]

All development on land covered by a local government's comprehensive plan, and all action taken by the government regarding that development, must comport with the plan. § 163.3194(1)(a), Fla. Stat. (2018); *see Dixon v. City of Jacksonville*, 774 So. 2d 763, 764 (Fla. 1st DCA 2000) ("It is well established that a development order shall be consistent with the government body's objectives, policies, land uses, etc., as provided in its comprehensive plan."). A comprehensive plan is essentially "a constitution for all future development within the governmental boundary." *Machado v. Musgrove*, 519 So. 2d 629, 632 (Fla. 3d DCA 1987).

The Legislature is clear in the Act about its expectation of complete consistency between a development order and the local comprehensive plan. The Act states the intent as follows:

> (6) It is the intent of this act that adopted comprehensive plans shall have the legal status set out in this act and that *no public or private development shall be permitted except in conformity with comprehensive*

---

[4] This listing is but a summary of the required elements. As we will see in a bit, a closer review of some of the cited provisions reveals that these elements overlap and interrelate. There is difficulty in trying to wholly isolate one element from the others in operation—an important point to keep in mind when assessing whether, as a practical matter, a consistency challenge could be limited just to one aspect of a plan.

6

*plans*, or elements or portions thereof, prepared and adopted in conformity with this act.

. . . .

(8) The provisions of this act in their interpretation and application are declared to be the *minimum requirements necessary* to accomplish the stated, intent, purposes, and objectives of this act; to protect human, environmental, social, and economic resources; and to maintain, through orderly growth and development, the character and stability of present and future land use and development in this state.

§ 163.3161, Fla. Stat. (2018) (emphasis supplied). Under the Act, complete conformity is the floor, not the ceiling. *See Dixon*, 774 So. 2d at 764–65 (applying strict scrutiny to zoning action subject to a consistency challenge, "a process which involves a detailed examination of the development order for *exact compliance with*, or adherence to, the comprehensive plan" (emphasis supplied)).

B.

With this in mind, we turn to the text of the statute at issue. Section 163.3215 from the start echoes the main point of the Act. It provides the "exclusive methods" by which "to appeal and challenge *the consistency of a development order with a comprehensive plan* adopted under [the Act]." *Id.* (1) (emphasis supplied). The subsection that the appellants sued under states as follows:

Any aggrieved or adversely affected party may maintain a de novo action for declaratory, injunctive, or other relief against any local government to challenge any decision of such local government granting or denying an application for, or to prevent such local government from taking any action on, a development order, as defined in s. 163.3214, *which materially alters the use or density or intensity of use on a particular piece of property which is not consistent with the comprehensive plan* . . . .

*Id.* (3) (emphasis supplied).

Highlighted are two relative (or adjective) clauses, appearing consecutively—"which materially alters the use or density or intensity of use," and "which is not consistent with the comprehensive plan." Despite the use of two non-restrictive relative pronouns ("which"), the absence of commas setting off either clause indicates that both clauses serve to restrict rather than provide additional information. *Cf.* ANTONIN SCALIA & BRYAN GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 142–43 (2012) (explaining the weakness of grammatical principle, as applied to statutory texts, regarding the use of "*that* in a restrictive relative clause and a comma plus *which* in a nonrestrictive relative clause"); *Kasischke v. State*, 991 So. 2d 803, 812 (Fla. 2008) (explaining that commas are used to set off nonrestrictive appositives, which "provide additional but *nonessential* information about a noun or pronoun immediately preceding" and merely "serve to further identify or explain the word they refer to" (citation to quoted text omitted)).

What, though, does each of these relative clauses limit? (Or, to state it a little differently, to what does each "which" go?) Resolution of the primary issue on appeal hinges on the answer to this question. The Second District in *Heine* characterized these back-to-back clauses as "clear and unambiguous," reading them to limit the "bases upon which a party may challenge a development order's purported inconsistency with a comprehensive plan" to three—use, density, and intensity of use. *Id.* at 1257. For us the text is a bit more turbid, meaning there is some interpretive work to be done before we can determine (de novo, naturally) how the statute applies to this case.

We have rules and constructs to help with this work. One that we follow, when it proves helpful, is the soi-disant "last antecedent rule," which states that a relative pronoun (like "which" or "that") "generally refers to the nearest *reasonable* antecedent." SCALIA & GARNER, *supra*, at 144 (emphasis supplied); *but cf. id.* at 146 (noting that the rule "applies to the last antecedent, unless the sense of the passage requires a different construction" (quoting *Sims' Lessee v. Irvine*, 3 U.S. (3 Dall.) 425, 444 n.* (1799)); *Kasischke*, 991 So. 2d at 811–12 (documenting criticism of the rule and noting that the rule would not apply where the "sense of the entire act" points in a different direction (internal quotation and

citation omitted)). It bears remembering from grammar school that relative pronouns take *nouns* as their antecedents, so the right *noun* is what we are looking for.

To be sure, the problem is not with the first relative clause. It reasonably modifies the noun term "development order," which immediately precedes the first "which." We say "reasonably" because the first clause—in a way that makes sense—culls from the various types of development orders just a few types based on their effects on particular aspects of a comprehensive plan *(viz.* "use or density or intensity of use"). *Cf.* § 163.3164(15), Fla. Stat. (defining "development order" as "any order granting, denying, or granting with conditions an application for a development permit"); *id.* (16) (defining "development permit" to include "any building permit, zoning permit, subdivision approval, rezoning, certification, special exception, variance, or any other official action of local government having the effect of permitting the development of land").[5]

Can we say the same for the second relative clause? No. The second clause is not nearly so easy. The noun (actually, noun phrase) immediately preceding the second "which" clause is "a particular piece of property." To apply the second clause *(viz.* "which is not consistent with the comprehensive plan under this part") to this noun phrase, we must be able to say the phrase works as a *reasonable* antecedent to the clause. But we cannot. Elsewhere in the Act, we see that the primary purpose of a comprehensive plan is to control government action regarding development and ensure that such action is entirely consistent with that plan. *See* § 163.3194(1)(a), Fla. Stat. (requiring that "all *development*

---

[5] Notably, "development," as used throughout the Act, is broad enough in meaning to include "any building activity . . . any material change in the use or appearance of any structure or land, or the dividing of land into three or more parcels." *Id.* (14); § 380.04(1), Fla. Stat. (2018). Development can be an increase in intensity of use on a piece of land, but it also can be the clearing of land in advance of construction, change in the external appearance of a structure, and alteration of a shore or bank, among other examples. § 380.04(2), Fla. Stat.

9

undertaken *by*, and *all actions* taken in regard to development orders *by*, *governmental agencies* in regard to land covered by such plan or element *shall be consistent with*" an adopted comprehensive plan (emphasis supplied)); *id.* (4)(a) (referencing comparison of "governmental action" to the comprehensive plan in judicial review). "Consistency" as it is used in the Act does not refer to the pieces of property themselves, but instead to government action. There is no sense, then, to modifying the noun phrase just before the second relative clause regarding consistency with a comprehensive plan. The noun phrase is not the reasonable antecedent for the second relative clause, so we must keep looking.

What about the series of nouns preceding the noun phrase we just discussed two paragraphs earlier—"use or density or intensity of use"? No again. For a development order to be subject to a consistency challenge, it must *materially alter* the use, density, or intensity designation on a property. "Materially alters" presumes a change to an *existing*, *consistent* use, density, or intensity designation. Application of the relative clause to this series of nouns, then, would not make sense, because there would be no reason to limit a claim of inconsistency to an established use, density, or intensity designation that necessarily will be consistent with the plan prior to the grant of a development order. And there certainly would be no reason to apply the limitation in a case where an application for a development order is denied. *Cf. Parker v. Leon County*, 627 So. 2d 476, 479 (Fla. 1993) (explaining that under a prior, but similar, version of this provision in section 163.3215, "the denial of an application does not alter the use or density of property [but] simply preserves the status quo [such that] no further action is possible").

Working our way backward, the next noun in line is the same "development order" that already serves as the antecedent to the first relative clause, which we mentioned above. As a matter of grammar and syntax, it would be unusual to have stacked relative clauses (like the two consecutive "which" clauses here) modifying the same antecedent. That does not mean it is not possible, and to say that the second "which" does reference "development order" would not be inconsistent with how a similar relative clause in nearby subsection four of the same statute could take

10

"development order" as an antecedent, as we will discuss further below.

Nonetheless, a slightly less grammatically awkward approach yields a similar result. Consider the following two parallel infinitive phrases in subsection three: "to challenge *any decision* of such local government *granting or denying* an *application <u>for</u>*," and "to prevent such local government from *taking* any *action <u>on</u>*." § 163.3215(3), Fla. Stat. (emphasis supplied). These infinitive phrases refer back to and modify "de novo action" (*i.e.*, the phrases tell us the purpose of the de novo action—"to challenge . . ." or "to prevent . . ."). In the first infinitive phrase, "granting or denying an application" is a participial phrase that operates as an adjectival modifier to "any decision," which in turn is the object of the infinitive at the beginning, "to challenge." In the second infinitive phrase, "taking any action" is a gerund phrase that operates as the object of the preposition "from," forming a prepositional phrase that tells us what "such local government" would be prevented from doing. The participial phrase in the first infinitive phrase and the gerund phrase in the second both point us to the target of the de novo review to be conducted under subsection three—a decision or action by local government. And we know from the two prepositions underlined in the quoted and highlighted text above—"for" and "on"—that the local government decision or action subject to challenge is with regard to a "development order."

From this we see there are two reasonable alternatives to serve as antecedents for the second relative clause. Both "development order" and the government decision or action regarding that order plausibly can serve in place of the second relative adjective "which" and receive the subject complement phrase "not consistent with the comprehensive plan." There is no meaningful difference between these antecedents in this context. *Cf. Bd. of Cnty. Comm'rs of Brevard Cnty. v. Snyder*, 627 So. 2d 469, 474 (Fla. 1993) ("Because an order granting or denying rezoning constitutes a development order and development orders must be consistent with the comprehensive plan, it is clear that

11

orders on rezoning applications must be consistent with the comprehensive plan.").[6]

This all may seem like an excessive amount of work to get to a correct reading of the statute. But it is work worth doing. It is what we must do to stay true to the Legislature's intent, as expressed in the text it adopted. *Cf.* SCALIA & GARNER, *supra*, xxviii–xxix (noting the inherent difficulty in textualist judging but explaining that the "interpretive conventions" of a "fair reading" approach will "narrow the range of acceptable judicial decision-

---

[6] We note that before 2002, the provision we are looking at now was the first subsection in the statute, and stated as follows:

> Any aggrieved or adversely affected party may maintain an action for injunctive or other relief against any local government to prevent such local government from taking any action on a development order, as defined in s. 163.3164, *which* materially alters the use or density or intensity of use on a particular piece of property *that* is not consistent with the comprehensive plan adopted under this part.

§ 163.3215(1), Fla. Stat. (2001) (emphasis supplied). The highlighted terms in this earlier version of the statute, much of which has carried forward into the version we are looking at, support our conclusion that the "is not consistent" clause was intended to have as its antecedent something other than the word immediately preceding it. In the earlier version, the first noun that is not part of the relative clause preceding "that," and that also is not the word that the first relative clause already has modified (*i.e.*, "development order"), is "any action." A later subsection in the same version of the statute (since removed) required that "[a]s a condition precedent to the institution of an action pursuant to this section, the complaining party shall first file a verified complaint with the local government *whose actions are complained of* setting forth the facts upon which the complaint is based and the relief sought by the complaining party." *Id.* (4) (emphasis supplied). The highlighted words in this provision further emphasize that the focus of any suit is the consistency of the local government action on a development order.

making" and "will curb—even reverse—the tendency of judges to imbue authoritative texts with their own policy preferences"); *id.* at 56 ("The words of a governing text are of paramount concern, and what they convey, in their context, is what the text means.").[7]

All of this is to say that we have let the text be our sole guide. As best that we can apply them here, rules of statutory interpretation and constructs of grammar and syntax[8] lead us to conclude that the second relative clause (again, "which is not consistent with the comprehensive plan adopted under this part") looks past the noun series "use or density or intensity of use" and modifies either "development order" or the local government action taken regarding such an order. We can find no reasonable, grammatically supportable reading of section 163.3215(3) that yields the limitation on the scope of a de novo consistency review that the trial court relied on in this case. A trial court in turn must conduct a de novo review of a development order challenged under section 163.3215(3)—provided the order alters the use, density, or intensity of use on a property—and determine whether there is *complete* consistency between the local government's action on that order and the local comprehensive plan. It cannot limit its review to just those inconsistency claims strictly relating to land use, density, and intensity of use.

C.

As a check on our interpretative work, we look at surrounding provisions in the same statute, and at related statutes that are part of the same Act, to determine whether our reading of section 163.3215(3) is consistent and compatible with those provisions and the Act as a whole. *Cf.* SCALIA & GARNER, *supra*, at 56 (explaining that "words are given meaning by their context, and context

---

[7] "Judicial power is never exercised for the purpose of giving effect to the will of the Judge; always for the purpose of giving effect to the will of the Legislature; or, in other words, to the will of the law." *Osborn v. Bank of the U.S.*, 22 U.S. 738, 866 (1824).

[8] *Cf.* SCALIA & GARNER, *supra*, at 140 ("Words are to be given the meaning that proper grammar and usage would assign them.").

includes the purpose of the text," but that "the purpose must be derived from the text, not from extrinsic sources"); *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988) ("Statutory construction [] is a holistic endeavor. A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme—because the same terminology is used elsewhere in a context that makes its meaning clear, or because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law." (internal citations omitted)).

Initially, we see that requiring a comprehensive consistency review under section 163.3215(3)—beyond just use, density, and intensity of use—satisfies at least one of the broader purposes of the Community Planning Act, of which the provision is a part. The Act in several places makes clear that it has a purpose to ensure that local development is in strict and *complete* compliance with a duly adopted comprehensive plan. *See* § 163.3161(6), (8), Fla. Stat.; § 163.3194(1)(a), Fla. Stat. The Act in fact sets a high and comprehensive bar for consistency, as follows:

> A development order or land development regulation shall be consistent with the comprehensive plan if the land uses, densities or intensities, *and other aspects of development* permitted by such order or regulation are compatible with and further *the objectives, policies, land uses, and densities or intensities in the comprehensive plan* and if it meets *all other criteria* enumerated by the local government.

§ 163.3194(3)(a), Fla. Stat. (emphasis supplied). In other words, there is no limitation on the aspects of a development order that the trial court should consider before concluding that the order (or the action on the order) is consistent with the comprehensive plan. Indeed, the Act nowhere mentions a carve-out from what is to be considered in a consistency review. Any review of a development order for consistency must consider whether there is *complete* consistency.[9]

---

[9] In fact, the scope of a consistency review is broader yet. Such a review also puts on the table the reasonableness of the plan or

14

So, while section 163.3215 limits a cognizable challenge to a development order that, at a minimum, alters use, density, or intensity of use, the Act as a whole (and section 163.3194(3)(a) in particular) essentially precludes the trial court from completing its de novo review for consistency without considering *all* of what is permitted by the order and determining whether the local government acted with respect to the order in a manner that is *entirely* consistent with the plan. Our refusal to read a carve-out into section 163.3215(3) for what the trial court must consider in its de novo consistency review comports with the holistic approach to consistency dictated by the Act.

Moreover, when we consider the variegated and intersecting elements required to be in a comprehensive plan (summarized earlier), we see that there is no practical way to limit a consistency review to just a few elements and still remain true to the expansive and non-modular approach to consistency found in section 163.3194(3)(a). *See* § 163.3177, Fla. Stat. For instance, a comprehensive plan must have a conservation element that "contain[s] principles, guidelines, and standards for conservation that," among other things, provides for the consideration of "type, intensity or density, extent, distribution, and location of allowable land uses and the types, values, functions, sizes, conditions, and locations of wetlands" as "land use factors . . . when directing incompatible land uses away from wetlands." *Id.* (6)(d)2.k.; *see also id.* (6)(a) (listing multiple overlapping criteria, studies, and analyses to be addressed in the "future land use" element of a comprehensive plan). In just this one example (and there are others), we see how the Act interweaves aspects of use, density, and intensity of use into other aspects of a comprehensive plan. A trial court could not assess those aspects in isolation in a de novo review and still make the complete-consistency determination expected in section 163.3194(3)(a). This further confirms our conclusion that claims of inconsistency with those other aspects remain relevant and cognizable and must be considered in the de novo review.

---

any of its elements, to the extent it relates to the government action at issue. *See* § 163.3194(4)(a), Fla. Stat.

15

We also find validation for our interpretation of section 163.3215(3) in the text of the subsections that come before and after. *Cf.* SCALIA & GARNER, *supra*, at 167 (explaining the overarching requirement that a text "be construed as a whole," which calls on judges "to consider the entire text, in view of its structure and of the physical and logical relation of its many parts" and allows for the construing of "one part of the statute by another part of the same statute"); *id.* ("If any section of a law be intricate, obscure, or doubtful, the proper mode of discovering its true meaning is by comparing it with the other sections, and finding out the sense of one clause by the words or obvious intent of the other." (brackets omitted) (quoting 1 EDWARD COKE, THE FIRST PART OF THE INSTITUTES OF THE LAWS OF ENGLAND, OR A COMMENTARY UPON LITTLETON § 728, at 381a (1628; 14th ed. 1791)).

Take subsection two. It defines an "aggrieved or adversely affected party" in terms of interests that are broader than just use, density, and intensity—*viz.* "interests related to health and safety, police and fire protection service systems, *densities or intensities of development*, transportation facilities, health care facilities, equipment or services, and environmental or natural resources." § 163.3215(2), Fla. Stat. (emphasis supplied). Why would the Legislature give standing to sue to a party based on interests—beyond the supposed limitations relied on by the trial court and indicated in the highlighted language—that the party then could not pursue in a consistency review action? Such a limitation makes no sense in the context of this definition.[10] The definition in

---

[10] Notably, a precursor to the current act was a response to public dissatisfaction with landowners' inability to challenge many types of inconsistent development. *See Pinecrest Lakes, Inc. v. Shidel*, 795 So. 2d 191, 199–200 (Fla. 4th DCA 2001); *id.* at 202 ("Under [the earlier version of] section 163.3215 citizen enforcement is the primary tool for insuring consistency of development decisions with the Comprehensive Plan."); *see also Parker v. Leon County*, 627 So. 2d 476, 479 (Fla. 1993) (noting that the Legislature enacted section 163.3215 in response to the supreme court's earlier ruling limiting third-party standing, "to ensure the standing [to challenge the consistency of a development order] for any person who will suffer an adverse effect to an

subsection two, then, also points to there being no limitation on the scope of a consistency review in a de novo action properly brought.

Then there is subsection four, which complements subsection three. Subsection four applies to those development orders that a local government designates through the process it adopts under that provision; subsection three applies to all other development orders. § 163.3215(1), Fla. Stat. Within section 163.3215, the two subsections provide the "exclusive methods for an aggrieved or adversely affected party to appeal and challenge" consistency between a development order and a comprehensive plan. § 163.3215(1), Fla. Stat. For both subsections to work together in a logical and consistent way—that is, for the latter subsection to be fairly considered a substitute for the process set out in the former—both provisions must be referencing the same type of development orders and the same type of consistency challenges. *Cf.* SCALIA & GARNER, *supra*, at 180 ("The provisions of a text should be interpreted in a way that renders them compatible, not contradictory."). We in turn can glean from the text of subsection four additional insight into how the Legislature intends for subsection three to work.

Here is what subsection four says, in pertinent part:

If a local government elects to adopt or has adopted an ordinance establishing, at a minimum, the requirements listed in this subsection, the sole method by which an aggrieved and adversely affected party may *challenge any decision* of local government *granting or denying* an application for a *development order*, as defined in s. 163.3164, *which materially alters the use or density or intensity of use on a particular piece of property, on the basis that it is not consistent with the comprehensive plan adopted under this part*, is by an *appeal* filed by a petition for writ of certiorari filed in circuit court no later than 30 days following rendition of a development order or other written decision of the local government, or when all local

interest protected by the comprehensive plan" (internal quotation and marks omitted)).

17

administrative appeals, if any, are exhausted, whichever occurs later. . . .

§ 163.3215(4), Fla. Stat. (emphasis supplied).[11]

According to the highlighted text, subsection four, like subsection three, limits the type of development order subject to challenge to one that "materially alters the use or density or intensity of use on a particular piece of property." When we compare that highlighted text to the equivalent text in subsection three, we see though that instead of the second relative clause from subsection three (*viz.* "*which* is not consistent with . . .") referring to the consistency review, there is a prepositional phrase (*viz.* "*on the basis that it* is not consistent with . . .") (emphasis supplied in both quotations). A prepositional phrase can function as either an adjective or an adverb.[12] Here, the prepositional phrase "on the

---

[11] The use of the term "appeal" in subsection four indicates that the trial court's review under this subsection is more deferential than it is under subsection three. *Cf. Snyder*, 627 So. 2d at 474 (explaining that "the rulings of a board acting in its quasi-judicial capacity [would be] subject to review by certiorari and . . . upheld only if . . . supported by substantial competent evidence"). Still, in the quasi-judicial hearing, the special master must "determin[e] whether a proposed development order is consistent with the comprehensive plan" under a strict scrutiny standard of review. § 163.3215(4)(f), Fla. Stat. Subsections three and four differ as to *who* conducts the consistency review in the first instance, but there is nothing in the text to suggest that the *scope* of that review is any different across the two subsections.

[12] When a prepositional phrase functions as an adjective, it allows a noun to do indirectly what it cannot do directly—modify another noun. The same idea applies to a prepositional phrase functioning as an adverb. In such a case, the phrase allows a noun to modify a verb or adjective indirectly, whereas it could not do the same directly.

basis . . ." functions as an adverb[13] and modifies the verb phrase "challenge any decision [on a] development order." The subordinating conjunction "that" following "basis" creates a nominal dependent clause (*viz.* "that it is not consistent with . . .") that serves as an appositive modifying "basis," which in turn, as we just explained, modifies the phrase beginning with "challenge." Because the "challenge" is to a local government "decision" regarding a development order application, we easily can say that the antecedent for "it" in the nominal dependent clause is either the government decision or the order. "Not consistent" is a subject complement describing "it," through the linking verb "is." We now can see that the target of the consistency review under subsection four is the entirety of the government decision or its order and not just "use or density or intensity of use."

Because subsections three and four are complementary, the grammatically cleaner approach to describing the scope of a consistency challenge in subsection four confirms the conclusion we reached about the same scope regarding subsection three. Our reading of subsection three—as requiring the trial court to consider all claims of inconsistency in its de novo review—in fact harmonizes with the scope of the consistency review described in subsection four; and our reading works hand-in-glove with the Act's other provisions designed to ensure complete consistency between development and a local comprehensive plan. Nowhere else in the Act is consistency treated as being limited in scope, and there is nothing in subsection three that expressly limits that scope.

D.

Let us now sum this up. There is no textual basis in section 163.3215 to limit the trial court's scope of review as to whether a challenged development order is entirely consistent with the comprehensive plan. While there is a limitation on what *types* of development orders may be subject to challenge—only those that materially alter the use, density, or intensity of use of a property—

_____

[13] The comma preceding "on the basis" sets off the relative clause that comes before and indicates that the prepositional phrase does not modify that clause.

the trial court's inquiry when considering whether there is consistency with the comprehensive plan is not limited at all. We hold that once an action is filed pursuant to section 163.3215(3) regarding the appropriate *type* of development order, the trial court must conduct a plenary review that considers *all* properly pleaded claims of inconsistency between the local government action regarding a development order and the comprehensive plan. Consequently, the trial court erred in its reliance on the Second District's decision in *Heine v. Lee County*, 221 So. 3d 1254 (Fla. 2d DCA 2017)—which, in our view, runs counter to the text of section 163.3215—even though that was the most on-point decision the trial court had available to it at the time. *See Weiman v. McHaffie*, 470 So. 2d 682, 684 (Fla. 1985) (explaining that in the absence of conflicting district court decision on the same point of law, a district court's decision on the point has "binding effect on all Florida trial courts").

There is no dispute here that Walton County's approval of the Cypress Lake PUD is a "development order" that materially alters the use, density, and intensity of property. Based on our holding here, the trial court should have considered all of the appellants' claims of inconsistency, even those that did not strictly relate to density and intensity. We reverse the judgment as to the consistency of Walton County's action on the Cypress Lake PUD order and remand for the trial court to consider the inconsistency claims it previously determined to be "not relevant." If there are still facts in dispute that are material to any of those claims, the trial court must resolve them. It then shall render a new judgment determining whether the development order is *entirely* consistent with the comprehensive plan, based on its determination of the remaining claims. The trial court's determination of consistency on the density and intensity claim was not challenged on appeal, so that determination has preclusive effect.

### III.

We turn now to SWCC's appeal of the trial court's determination that it lacked standing to sue under section 163.3215(2). Here, too, we conclude that the trial court erred.

On the question of standing, the evidence showed that SWCC is a non-profit corporation with its principal place of business in

Walton County, founded "to foster, protect, and enhance the character and welfare of the neighborhoods and communities in the area . . . known generally as South Walton County." SWCC seeks to ensure that land developers comply with Walton County's comprehensive plan. The individual appellants (Imhof and Bullard), who remained in the suit, are members of SWCC. The director of SWCC described the organization as "a watch dog group" that "provide[s] a resource" so the public "can take a project that they are not comfortable with and help them articulate the grounds for objecting to it." He explained that SWCC's purpose is to "foster environmental understanding through education programs, and to get involved in environmental projects . . . . And also, to ensure the integrity of the development process and the application of the standards for development in Walton County."

The trial court concluded SWCC did not have standing because it "failed to establish that it possesses any interest in the [Cypress Lake PUD] project beyond that shared by all persons." The appellees contend that SWCC exists solely to litigate development orders on behalf of local landowners, and because of this, its concerns about environmental protection and ensuring consistent development are not legitimate. They point out that no members of SWCC live on the land where Cypress Lake would be developed, and that the organization has not shown any particularized interest in ensuring consistency with the comprehensive plan that goes beyond that of the general public.

This line of argument misses the point of the statute. The particular breadth of standing authorized by the statute reflects its primary purpose—"to remedy the governmental entity's failure to comply with the established comprehensive plan," not "to redress damage to particular plaintiffs." *Nassau County v. Willis*, 41 So. 3d 270, 276 (Fla. 1st DCA 2010) (quoting *Save the Homosassa River All., Inc. v. Citrus County*, 2 So. 3d 329, 340 (Fla. 5th DCA 2008)).

Section 163.3215 grants a cause of action to "any aggrieved or adversely affected party." *Id.* (1). The statute defines that term as follows:

> [A]ny person or local government that will suffer an
> *adverse effect to an interest protected or furthered by the*

21

*local government comprehensive plan*, including interests related to health and safety, police and fire protection service systems, densities or intensities of development, transportation facilities, health care facilities, equipment or services, and environmental or natural resources. The alleged interest may be shared in common with other members of the community at large *but must exceed in degree the general interest in community good shared by all persons*. The term includes the owner, developer, or applicant for a development order.

§ 163.3215(2), Fla. Stat. (emphasis supplied). By the highlighted text—requiring that there merely be an adverse effect on an interest that could be held in common with the community—the statute significantly "liberalizes standing requirements" for actions under it. *Parker v. Leon County*, 627 So. 2d 476, 479 (Fla. 1993) (quoting *Sw. Ranches Homeowners Ass'n, Inc. v. County of Broward,* 502 So. 2d 931, 935 (Fla. 4th DCA 1987)); *see also Willis*, 41 So. 3d at 278 ("Section 163.3215 establishes a broad legislative grant of standing which we are not at liberty to reject."). This liberalized standing enables "[c]itizen enforcement" to be "the primary tool for holding local government to its land use 'constitution,' [*i.e.*, comprehensive plan]." *Willis*, 41 So. 3d at 276.

The one limitation on standing is simply a matter of degree. That is, standing under the statute stems from the significance of the interest to the party, not the particularity or distinctiveness of the interest. *See Willis*, 41 So. 3d at 277 (highlighting that the statute "does not require an adverse interest different in kind" or different in terms of "the fundamental nature or quality" of the interest, just that "the *intensity* of the activity or interest must exceed that of the general public" (emphasis supplied)). A party can establish standing under the statute by showing that it engages in activities related to a protected interest that set it apart from the community at large. *Cf. Willis*, 41 So. 3d at 278 (agreeing that plaintiffs had standing because they engaged in recreational activities tied to the natural resources of the affected area).

A comparison of SWCC's *degree* of interest in the area surrounding the proposed Cypress Lake PUD with the *degree* of interest that the *Willis* Court found sufficient to support standing

leaves little doubt that SWCC satisfies the minimal standing requirements of section 163.3215(2). SWCC operates as a "watchdog" group, engaged in activities to protect environmental interests now alleged to be adversely affected by a supposed violation of the comprehensive plan. By its activities, SWCC showed it is more animated or motivated by an affected interest protected by the plan than the average member of the public. This is enough to make the required showing of an elevated degree of interest. *Accord Homosassa River All.*, 2 So. 3d at 337 ("[A]n organization has an interest that is greater than 'the general interest in community well-being' when the organization's primary purpose includes protecting the particular interest that they allege will be adversely affected by the comprehensive plan violation." (citation and internal quotation omitted)); *Willis*, 41 So. 3d at 277–78 (affirming trial court's determination that plaintiffs established standing by demonstrating, among other things, that they were "members of an organization whose primary purpose is the study and protection of natural resources and the advocacy of sound land use and growth management policies affecting the environment").

The trial court erred in its application of the definition of "aggrieved or adversely affected party" to the facts before it. SWCC sufficiently demonstrated that it had standing to participate as a plaintiff in the consistency action. Accordingly, on remand, we direct the trial court to reinstate SWCC as a plaintiff for the balance of the proceedings on the appellants' inconsistency claims.

IV.

Finally, we reverse the amended final judgment for costs, which was rendered in favor of Ashwood and is on appeal in Case Number 19-1530. Because we are reversing the final judgment and remanding this case for further proceedings, there no longer is a prevailing party for the purpose of taxing costs. *See Marty v. Bainter*, 727 So. 2d 1124, 1125 (Fla. 1st DCA 1999). A cost judgment "predicated on a reversed or vacated final judgment also must be reversed." *Id.* Nevertheless, we offer no opinion as to whether any party is entitled to an award of costs as a prevailing party at this point. We leave that assessment to the trial court after it disposes of the remaining inconsistency claims and renders a new final judgment.

23

\* \* \*

In Case Number 19-980, we REVERSE the final judgment; REMAND the case for further proceedings in accord with our instructions; and CERTIFY CONFLICT.

In Case Number 19-1530, we REVERSE the amended judgment for court costs.

ROWE, C.J., and RAY, J., concur.

_____

***Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.***

_____


Terrell Arline of Terrell K. Arline Attorney at Law, Tallahassee, for Appellants.

Sidney N. Noyes and Heather R. Christman, Office of the County Attorney, DeFuniak Springs, for Appellee Walton County, Florida; Dana C. Matthews and C. Stephen Tatum of Matthews & Jones, LLP, Destin, for Appellee Ashwood Holdings Florida, LLC.

Robert N. Hartsell, Heidi Mehaffey, and Shai Ozery of Robert N. Hartsell, P.A., Pompano Beach, for Amicus Curiae 1000 Friends of Florida, Inc.; Nancy E. Stroud of Lewis, Stroud & Deutsch, P.L., Boca Raton, for Amici Curiae The American Planning Association, Florida Chapter and The American Planning Association.